## ARNOLD, ET AL. v. BOND, ET AL.

(No. 1877; June 19, 1934; 34 Pac. (2d) 28)

For the appellants, there was a brief and oral argument by *Mr. W. O. Wilson*, of Cheyenne.

238

For the respondents, there was a brief by *Ray E. Lee,* Attorney General, *O. O. Natwick,* Deputy Attorney General and *Wm. C. Snow,* Assistant Attorney General, and oral argument by *Mr. Lee.*

BLUME, Justice.

This case was brought by plaintiffs, citizens and taxpayers of this State, on behalf of themselves and all other persons similarly situated, against the Board

of Trustees of the University of Wyoming, the Board of Land Commissioners, the Commissioner of Public Lands, and the State Auditor and the State Treasurer. Plaintiffs ask that the court declare and determine the constitutionality and validity of Chapter 21 of the Session Laws of Wyoming, passed at the Special Session of 1933; to declare, determine and construe the rights of the respective parties to the suit with respect to the power claimed to be conferred thereby on the Board of Trustees of the University of Wyoming, and to enjoin such board from carrying the legislative act into effect. The special matters herein involved will be mentioned later. A demurrer was filed and sustained on the ground that the petition as amended does not state facts sufficient to constitute a cause of action. Plaintiffs elected to stand on their pleading and have appealed from a judgment of dismissal entered pursuant thereto.

The Legislature at its special session in 1933 passed Chapter 21. Sections 1, 2 and 4 thereof, the only ones material herein, are as follows:

"Section 1. That The Trustees of the University of Wyoming, a body corporate, is hereby authorized and empowered to accept grants of money or borrow in sums not exceeding in all Three Hundred Thousand Dollars ($300,000.00) Dollars from the Government of the United States, or any duly authorized agency thereof, for the construction of a Liberal Arts building to be erected upon the campus of said University at Laramie, Wyoming, upon the following conditions and no others, to-wit:

The Trustees of the University of Wyoming is empowered to contract for the repayment of said loan or loans solely by the creation of a first lien upon the income of that fund known as the University Permanent Land Fund, more specifically identified by Section 8 of the Act of Admission of The State of Wyoming.

Section 2. That nothing in this Act shall be construed to empower The Trustees of the University of

Wyoming to obligate in any way whatsoever the general credit, or any other funds, property or assets of The State of Wyoming, of the University of Wyoming, or of any other institution under the charge of said The Trustees of the University of Wyoming, except the income, and the income only of that fund described in Section 1 of this Act.

Section 4. That nothing in this Act shall be construed to change, alter, diminish or increase the powers of The Trustees of the University of Wyoming as elsewhere set forth and determined by the laws of The State of Wyoming, except insofar as is necessary to give effect to the purposes and objects specifically set forth in this Act."

Pursuant to the power thus conferred, the Board of Trustees of the University of Wyoming applied to the Federal Emergency Administration of Public Works for a loan of $300,000 for the purpose expressed in the legislative act, and agreed to repay the loan on an amortization plan and by the creation of a first lien upon the income of the University Permanent Land Fund. The amount so agreed to be repaid is, generally speaking, in annual installments, composed of principal and interest, payments to commence on January 1, 1935, and ending January 1, 1966. The total amount of principal to be repaid is the sum of $210,000. In other words, the United States will contribute the sum of $90,000 toward the erection of the contemplated building. The total interest agreed to be paid is approximately the sum of $142,390.41, making the total repayment the sum of $352,390.41, as against $300,000 received. The annual repayment, principal and interest, to be made, will be the sum of $11,417.98, except that interest only will be paid to January 1, 1937. By an amended application the Board agreed as follows:

"The Trustees of the University of Wyoming agree, if desired by said Public Works Administration, to issue notes or bonds of such character as may be acceptable to the said Public Works Administration, se-

cured by the income of the said University Permanent Land Fund; or issue other evidences of such debt secured by the income of said University Permanent Land Fund."

The University Permanent Land Fund amounts approximately to the sum of $2,000,000, bringing in an annual income of over $100,000, so that approximately ten per cent only of the annual income from the fund will be required for the purpose of meeting the amounts annually agreed to be repaid as above mentioned.

The fund here in question was derived from a land grant by the United States to this state. It originated with the act of Congress of February 18, 1881 (St. at Large, 21, 326). That act granted to Wyoming and other territories 72 sections of land for the. "use and support" of a university in each of the territories embraced in the act. Under it the land was not to be sold for less than $2.50 per acre, and. the money derived from the sale was to constitute a university fund. It was further provided that:

"No part of said fund shall be expended for university buildings, or the salary of professors or teachers, until the same shall amount to $50,000, and then only shall the interest on said fund be used for either of the foregoing purposes until the said fund shall amount to $100,000, when any excess, and the interest thereof, may be used for the proper establishment and support respectively of said universities."

Under section 8 of the Act of Admission of this State, the 72 sections of land granted by the foregoing act were vested in the State of Wyoming. It provided further:

"But said act of February 18th, 1881, shall be so amended as to provide that none of said lands shall be sold for less than $10.00 per acre, and the proceeds shall constitute a permanent fund to be safely invested

and held by said state, and the income thereof shall be used exclusively for university purposes."

By section 1 of Article 18 of the Constitution, the state accepted the land grants made by the United States, with the conditions and limitations imposed by Congress, and by section 2 of the same article it is provided that "the proceeds from the sale and rental of all lands and other property donated, granted or received or that may hereafter be donated, granted or received from the United States or any other source shall be inviolably appropriated and applied to the specific purposes specified in the original grants or gifts." Sections 3 and 4 of the same article make further regulations as to such lands, but the provisions thereof are immaterial herein. The University of this state was established in 1886, and the establishment thereof confirmed by Section 15 of Article 7 of the Constitution, and that section, too, provides that the lands granted shall be devoted exclusively "for the purposes for which they were granted." Section 17 of the same article provides for the management of the University by seven trustees, and for two unofficial members without vote, and that "the duties and powers of the trustees shall be prescribed by law." The legislature has enacted laws in conformity with that section. Sections 108-401-530. It is not necessary to set out the detailed provisions thereof, except to say that under Section 108-506 the Board of Trustees constitutes a body corporate. These laws do not, in terms at least, authorize the board of trustees to borrow money as proposed. But Chapter 21 of the Laws of the special session of the legislature of 1933 purports to do so, and the question herein is as to whether that law is constitutional and in conformity with the grant of land by Congress for university purposes. Various questions have been raised in that connection. Thorough

briefs of counsel for the parties herein have considerably lessened the labor of the court.

1. It is argued that the income from the fund in question cannot be used for the purpose of erecting buildings, but for the purpose of current expenses only. The cases of Roach v. Gooding, 11 Idaho 244, 81 Pac. 642; Independent School District v. Pfost, 51 Idaho 240, 4 P. (2d) 893; Sheldon v. Purdy, 17 Wash. 135, 49 Pac. 228, are cited to sustain that contention. These cases are based on the theory that the term "support" means and refers to current expenses only. It is the contention of plaintiffs that these cases apply here for the reason that, while section 8 of the Act of Admission provides merely that the income from the fund in question shall be used "for university purposes," these purposes are limited by section 5 of the Act of Admission, which provides that "all lands herein granted for educational purposes shall be disposed of only at public sale, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the *support* of said schools." Counsel for the defendants contend that this section relates only to lands belonging to the common school fund, citing State v. Rice, 33 Mont. 365, 83 Pac. 875; State v. Candland, 36 Utah 406, 104 Pac. 285, 24 L. R. A. N. S. 1260, and other cases. It is not, however, necessary, we think, to pass upon that point, for if we assume that that particular provision should be construed as relating to lands of the university as well as that belonging to the common school fund, the conclusion that the term "support" excludes the right to use any part of the money for erecting buildings does not necessarily follow. The meaning of the term "support" was discussed in the case of State v. Board, 8 Wyo. 104, 55 Pac. 451, and it was held that it included the erection of buildings as well. The court, speaking through the late Chief Justice Potter, said:

"The statutes of this State have for many years provided that there shall be levied annually a tax 'for the support of the common schools.' The Act of Admission grants to the State sections 16 and 36 in every township 'for the support of common schools.' Would it be contended in the absence of express, adverse legislative provision that school houses could not be erected or repaired from the proceeds of the tax, or the income, or avails from the donated public lands? Is not the erection of suitable buildings as necessary a part of the support of the common schools, as the employment of teachers? What feature in the support of any public institution is more essential than providing a house in which its operations may be carried on, or in making such repairs as its condition demands?"

In any event the term "support" may be used in a narrow and in a broad sense, and when used in the latter sense, may include "current expenses, maintenance, upkeep, continuation of existing functions, as well as appropriations for new buildings." State v. Claussen, 85 Wash. 260, 148 Pac. 28. Bearing in mind that the act of February 18, 1881, permitted the use of the funds therein mentioned for building purposes under certain conditions, and bearing further in mind that the enabling act permits or requires the use of the income "for university purposes," we think we are justified in holding that the use of such income was not intended to be confined to current expenses, but may, if necessary and proper, be used for erection of buildings as well, provided, of course, that legislative authority for such purpose has, as in the case at bar, been granted.

2. Article 16 of the Constitution contains provisions for the limitation of indebtedness. Section 1 thereof provides:

"The state of Wyoming shall not, in any manner, create any indebtedness exceeding one per centum on the assessed value of the taxable property in the state, as shown by the last general assessment for taxation,

preceding; except to suppress insurrection or to provide for the public defense."

Section 2 thereof provides:

"No debt in excess of the taxes for the current year, shall in any manner be created in the state of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people and by them approved; except to suppress insurrection or to provide for the public defense."

The question is whether either of these sections is violated by the legislative act in question and by the proposed loan. There is no such violation, of course, if the indebtedness is not a state debt, or if by reason of the payments to be made only out of the income of the university fund, liability thereon is limited so as not to be a charge on the tax payers of the state. In the case of State ex rel v. McMillan, 12 N. D. 280, 96 N. W. 310, bonds issued by the trustees of a Normal School were held invalid as being an obligation of the state. The law in question in that case provided that the interest should be paid out of the income from lands granted to the state for normal school purposes, and that if such income should prove to be insufficient, the remainder should be paid out of the general fund of the state. In the case of State ex rel. v. Candland, 36 Utah 406, 104 Pac. 285, 24 L. R. A. N. S. 1260, bonds issued for the erection of buildings at the Utah University were held invalid. The land board was authorized under the law to take $250,000 from the principal of the university fund and loan it to the University Board. The income from the fund was, under the law, to be turned over to the board as usual, and the principal and interest on the loan was directed to be paid out of any money in the hands of the board or appropriated for its use. It was held that the loan was an indebtedness of the state, and that the effect of the payments of principal and interest on the loan in the manner specified by the law meant merely that the tax

payers of the state would be compelled to make up that amount in some other way. The legislative act in the case at bar does not contain the specific and objectionable features above mentioned. The majority of courts have held that an obligation similar to that involved in the case at bar is not a debt of the state. State ex rel. Bickford v. Cook, 17 Mont. 529, 43 Pac. 928; Stein v. Morrison, 9 Idaho 426, 75 Pac. 246; Lewis v. Brady, 17 Idaho 251, 104 Pac. 900, 28 L. R. A. N. S. 152; State ex rel. v. Collins, 21 Mont. 448, 53 Pac. 1114; Barbour v. State Board, 92 Mont. 32, 13 P. (2d) 225; State ex rel. v. Regents, 32 N. M. 428, 258 Pac. 571; State ex rel. v. Claussen, 134 Wash. 196, 235 Pac. 364; Allen v. Grimes, 9 Wash. 424; Fanning v. University of Minnesota, (Minn.) 236 N. W. 217; Caldwell v. Board, 176 La. 825, 147 So. 5. In McClain v. Regents, 124 Or. 629, 265 Pac. 412, the court held that while the obligation involved in that case, which was similar to that involved in the case at bar, was that of the state, it did not violate the constitutional provisions relating to limitation of indebtedness, in view of the fact that it could be paid only out of a particular fund. In the case of State ex rel. v. Claussen, supra, it appears that the legislature authorized the issuance of bonds for the purpose of erecting a capitol building, the bonds, both principal and interest, to be paid only out of revenues derived from the grant of lands for capitol building purposes. The validity of the bonds was upheld. Holding that they did not create an indebtedness of the state, the court said:

"The legislative act under discussion expressly provides that the principal and interest of the bonds authorized shall be payable only from revenues hereafter received from the lease and sale of the granted lands. In no possible way is the credit of the state involved. Not one dollar of its general property can be used to discharge those bonds or the interest on them. Not one dollar of taxes can be put to that purpose. * * * * Its

(the state's) only obligation under this act is to see that all the revenues hereafter received from the lease or sale of the granted lands shall be applied towards the payment of these bonds and their interest. On no principle of law can it be said that under these circumstances any debt has been contracted 'by or on behalf of this state.' "

The court then distinguishes Rodmay v. Munson, 13 Barb. 63, and Newel v. People, 7 N. Y. 63, where bonds issued, to be paid out of a particular fund, were held to create a debt of the state, and proceeds to say:

"There the revenues pledged came from the operation of canals owned by the state in its proprietary capacity. Its revenues when collected belonged to the state, and might be applied towards the discharge of any of its general obligations. Any amount of the funds so arising, which must go to the discharge of the certificates which were sought to be issued, would have been made up by taxation of the property within the state or of its people in some form or other. The situation here is very different. These granted lands do not belong to the state in the ordinary sense, and any moneys coming from them can be used only for the purpose of constructing capitol buildings. To us the distinction between those cases and this one is very clear."

In the case of State v. Regents of University, 32 N. M. 428, 258 Pac. 571, the regents were sought to be enjoined from issuing bonds for building purposes, payable only out of the income of the university land fund. The court said:

"The Attorney General argues that the proposed bonds are in effect the obligation of the state, and as such may be issued only in compliance with the provisions of section 8 of article 9 of the Constitution, which requires that any law authorizing any such debt shall provide for an annual tax levy sufficient to pay interest and provide a sinking fund, and each law shall be submitted to a vote of the people for approval, neither of which requirements have been complied with. The argument is unsound and based upon a false

premise. * * * * It (the University) proposes to contract with its bondholders that it will appropriate out of its income sufficient sums of money to pay interest and provide a sinking fund for the retirement of the bonds. It does not propose to mortgage its property in specie. It simply agrees to pay out of its income. How it can be said that this will be an obligation of the state, we cannot understand. This is simply a contract of the University to pay out of a designated fund when received. It is no more an obligation of the state than would be the obligation to pay the salaries of the University faculty. The mere fact that the University is the creature of the state and one of its instrumentalities to carry out its governmental functions is not controlling. The state has given the University certain property rights and has authorized it to make use of the same in a certain manner. This the University is proposing to do, and we can see no objection to the same."

We are inclined to agree with the opinion of the majority of the courts. The legislative act in question here specifically provides that only the income from the university land fund, and not the general credit of the state or any property whatsoever except such income shall be obligated under the loan. We do not see why we should not give this language its natural meaning, or construe the act as creating a greater obligation, moral or otherwise, than it purports to create, when the terms thereof are clearly known before the proposed loan is made. The argument that the tax payers of the state will be compelled to make up the principal and interest paid out on the loan has, of course, force from a practical standpoint and cannot be overlooked. Theoretically, the legislature may, or may not, appropriate out of the general funds or otherwise the amount so to be paid. It is not, theoretically, compelled to do so. Of course, if the proposed loan were of such amount that as a result of it the legislature would practically be compelled to make up the payments under the loan by taxation in order that the

university might be able to function as such in a reasonable way, a different question would arise, and we should probably not be warranted in that case to waive aside the objection here discussed merely because of the theoretical side of the question. But, as will be shown in another connection, the loan is not of that amount. We may add that this opinion should not be construed as permitting the state or its subdivisions to borrow money by the pledge of a special fund for repayment. No such general question is before us, and this opinion is strictly confined to the specific questions before us.

3. Another point argued is as to whether or not the board of trustees of the university may issue bonds to evidence the proposed loan. It is claimed that Chapter 33 of the Special Session of the legislature confers such power. Section 1 of that chapter authorizes "public authorities, public agencies, political subdivisions, public municipal instrumentalities and municipalities, public corporations, boards and commissions" to apply for loans to the Federal Emergency Administration of Public Works. Section 2 authorizes the execution of such documents and instruments as may be required to evidence the loans. The difficulty is that the end of that section states: "provided that nothing in this section shall authorize any authority to incur any debt beyond the current year's income without the vote of the people." It would seem that under this provision, the exercise of the power granted in Chapter 21, supra, must either be approved by a vote of the people or Section 2 of Chapter 33, supra, does not apply herein. We are inclined to take the latter view. Chapter 21 was passed and approved on December 20, 1933; Chapter 33 on December 23rd, 1933. There is nothing in the latter chapter which specifically indicates that it was intended to modify the former chapter so as to require the people to vote on the exercise of

the power given. Chapter 21 was passed to meet a specific purpose, Chapter 33 to meet a general purpose, and we believe that the former should control herein.

Section 4 of Chapter 21 gives the Board of Trustees of the University the power to do whatever is necessary to effect the purposes and object of the chapter. Courts are divided, as to whether or not the power of a municipality to borrow money implies the power to issue bonds. But it is further held that the power may be clearly implied. 44 C. J. 1177. That rule may be applied here. If the lender herein cannot or will not make the loan without the issuance of bonds, the board of trustees must do so in order to effect the purposes of the law. It is not in position, under the circumstances, to demand that the loan be made upon its terms and conditions as is more or less true when dealing with private parties. The power to issue bonds was held to be implied in McClain v. Regents, supra, under facts similar to those in the case at bar. We think the power is implied under the provisions of Chapter 21, supra, the bonds to be limited in their scope, of course, as therein prescribed, and they, and the interest thereon, can be made payable only out of the income as therein stated.

4. The further and the main point herein arises as to whether or not the use of the income of the fund in question may be anticipated. That this may be done is assumed in the New Mexico case heretofore cited, and the same may, perhaps, be said of McClain v. Regents, supra, and State ex rel. v. Collins, supra, although the question was not discussed in any of these cases, nor have we found any case in point. We have been referred to Section 6 of Article 18 of the Constitution, which provides that "if any portion of the interest or income of the perpetual school fund be not expended during any year, said portion shall be added to and become part of the said school fund." It may

be doubted that the section refers to the university fund. But even if it does, it at most but hints at the point above mentioned, and we cannot feel safe in basing our decision thereon. The term "income" involves time as an essential element, and generally refers to a given period. 31 C. J. 400. It can hardly be doubted, that ordinarily at least, the very purpose of the grant of income of a trust like that involved in the case at bar is intended for support from year to year and as it accrues. Private *cestuis que* trust, it is true, may, in the absence of a statute or a provision in the grant to the contrary, alienate income before it becomes due. 65 C. J. 551. But that, we take it, is based on the rule of freedom of contract. No such principle applies in the case of public bodies. And we should think that such alienation in their case ought not to be held to exist unless the power is expressly given or implied in the grant, and then only to the extent so implied, so that the fundamental purpose of the trust may not be frustrated. To appropriate and use the income thereof by pledging it in one year when it will not come into existence for, say, thirty years, or any other term, would seem to be clearly against public policy, and should, if the power to do so is implied in the grant, never be extended to the point when it would be subversive of the fundamental purpose for which the fund was created, namely, the support and maintenance of the institution from year to year. It is held that an assignment of unearned salary of a public officer is against public policy and void. 5 C. J. 872. This is on the theory that the efficiency of the officer to perform his public functions should not be weakened. The like reason exists in a case like that at bar. If an institution with a regular income is permitted to assign that of future years, its efficiency during that time is apt to be diminished, and to guard against that is one of the very purposes of the creation

of a grant like that involved here. This much is certain, that if all the income were pledged in perpetuity in order to repay a loan used for university purposes now, the effect would be to destroy the very principal of the fund. That, it is too clear for mention, could not be done. The question therefore is, as to whether it is permitted to stop short of that, and if so, how far? Is the method sought to be taken herein a partial and temporary destruction of the fund or the income thereof which is not permissible? If we should apply the strict rules of logic, we should, we think, answer in the affirmative, and should be compelled to hold the law in question to be invalid. We realize, however, and we have held, that these rules must, at all times, be tempered by other considerations. First National Bank v. Ford, 30 Wyo. 110, 126, 216 Pac. 691, 31 A. L. R. 1441. The attorney general freely admitted on oral argument that, in order that a law, which permits a loan against the income of the fund, may be valid, it must be reasonable as to the amount and the time of the loan. And he contends that it is reasonable in the case at bar. The criterion thus proposed is probably too broad, unless limited to the special circumstances in this case. But we have said that the income from the fund in question may be used not only for current expenses but for the erection of buildings as well, and the latter right can, we think, give rise to an implied power of anticipating the income, provided that the exercise of that power is reasonably consistent with all the purposes of the trust. If, then, it can be said under the facts in this case that the fund and the income thereof will not, on the whole, be impaired and affected adversely in contemplation of the grant, we should, we think, uphold the legislative act in question and the proposed loan. Turning then to the facts, we find that only approximately ten per cent of the income of the fund will be needed to repay the loan on the

amortization plan already mentioned, and there seems to be no reason to think that the proportion will be increased during the time necessary to repay the loan. The legislature may be presumed to know the condition and the needs of the university. The act in question may be taken as a declaration that it needs the proposed building, and that at the same time the repayment of the loan will not in any substantial manner impair the essential functions of the university. The Federal Government will contribute ninety thousand dollars toward the erection of the proposed building. The total amount to be repaid will be about $352,000. In other words there will, under the amortization plan, be paid for the use of the total sum of $300,000 interest at the rate of only approximately one per cent per annum, when we know that money obtained from other sources could probably not be obtained at less than four per cent, and it is not unlikely that it would be more. The life of the proposed building should last at least as long as the proposed loan. And even if by accident it should cease to exist, so that further payments would then be foreign to any then existing university purposes, we may well presume that such accident will be guarded against by proper insurance. Taking all of these facts into consideration, and solely in view of these special facts, we have come to the conclusion that we cannot say that the legislature was wrong when it determined, as it must be presumed to have done, that the fund and the income thereof would not, on the whole, inconsistent with all the purposes of the trust, be adversely affected and impaired. Courts will not hold a law invalid, if it can be upheld on any reasonable ground, and we think we should uphold it in this case, leaving the blame for any folly, if folly there is, to rest where it should— with the legislature and the board of trustees of the university. The legislature is ordinarily the sole judge of the policy, wisdom

and expediency of statutes. State v. Buck Mercantile Company, 38 Wyo. 46, 56, 264 Pac. 1023. And even though we should, perhaps, not entirely ignore that phase (12 C. J. 703), we should bear in mind that our individual feeling of apprehension of future danger, if any, might lead us to err. Speaking individually and generally, and not for the court, it is not, perhaps, surprising that such apprehension should exist and in no small degree. The favorable aspects presented in the case at bar would have a tendency to allay it in this particular instance, were it not for the fact that here a new field, heretofore considered sacred, is invaded for the purpose of exploration. Is there no end? Many of us were not brought up in the bosom of luxury, nor did we sleep in marble halls. The village schools with their humble surroundings, and the university campus graced with edifices hoary with age, seemed to us to satisfy the longings for learning. We heard at that time of the wrecks and ruins of the past brought about by mortgaging the future, ordinarily generously indulged in under pretense of benefit to the children yet unborn, but often in reality with the purpose that the living may enjoy the magnificence of the present at the expense of posterity—the forgotten man. We heard of the existence in the past of cities, once humming with the glad refrain of hundreds of thousands of happy human beings, lying now desolate, with their stately baths, their roomy porticoes, their sacred shrines in ruins because no space, no corner, no nook had become exempt from the invasion of the gatherer of public burdens. Do ruins tell tales merely to be scorned? But perhaps we heard wrongly. Times change. Younger generations perhaps learn better than their elders. The tide of the day sweeps us along into whirlpools which seem giddy. We can but hope that they may not be what they seem.

The judgment of the trial court is affirmed.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.