IN RE GREYBULL VALLEY IRR. DIST.
DONOVAN, ET AL., IRRIGATION COM'RS. v.
OWEN, ET AL.

(No. 2061; February 15, 1938; 76 Pac. (2d) 339)

(Rehearing Denied March 22, 1938)

480

482

For the appellants, there was a brief by *M. L. Simpson* of Cody, *Lin I. Noble* of Thermopolis and *H. B. Henderson, Jr.* of Cheyenne, and oral arguments by *Messrs. Simpson* and *Henderson.*

For the respondent, there was a brief and an oral argument by *Mr. E. J. Goppert* of Cody.

BLUMÈ, Chief Justice.

The Greybull Valley Irrigation District was organized in 1920, and assessments for benefits were confirmed in 1921. The district was unable to sell its bonds, and nothing further of importance was done in the matter until the district, seemingly in 1934, opened up negotiations with the Government of the United States, for the purpose of procuring from the latter a grant and an agreement to purchase the bonds of the district. These negotiations resulted in a contract, entered into in 1935, referred to as bearing date April 23. The date so far as the record shows is uncertain. But that is immaterial. Under the contract, the Government of the United States agreed to purchase the bonds of the district in the principal sum of $845,000, and to make a grant to the district of approximately $300,000. In view of these negotiations, the commissioners of the district on April 21, 1935, filed their petition, praying for the reinstatement of all assessments for benefits, as originally fixed, without change. On July 5th of that year the court entered an order changing the assessments to some extent, but generally confirming the assessments previously made. An appeal was taken therefrom. The order was reversed by this court on February 25, 1936. 49 Wyo. 395, 54 P. (2d) 808. We expressed our opinion to the effect that future proceed-

ings in the case should include a general re-assessment, to be reported for confirmation. The commissioners of the district thereupon, and on March 11, 1936, filed their report showing a re-assessment of benefits and assessments for construction, a description of the new boundaries of the district and other matters. On the same day on which the report was filed the Hon. P. W. Metz, Judge of the Fifth Judicial District, entered an order, requiring notice of the report and petition to be given and setting it for hearing on April 9th, 1936. On April 2nd, 1936, certain objectors, appellants herein, 43 in number, filed a motion, supported by affidavit, for a change of judge in the cause on the ground of bias and prejudice of the presiding judge of the district. Like objections were made to the Hon. C. D. Murane, Judge of the Eighth Judicial District. Thirty or more other objectors did not join in the motion. Thereupon, and on April 8, 1936, the Hon. P. W. Metz, the presiding judge of the district, made a general assignment of cases in Big Horn County, Wyoming, assigning the Hon. Harry P. Ilsley to preside in these cases, the order being as follows:

"Whereas there are certain matters and cases pending in said court that require the attention of another judge, other than the presiding judge of said district, Now therefore, it is hereby ordered that the Hon. Harry P. Ilsley, Judge of the Sixth Judicial District of the State of Wyoming, be and he is hereby designated and requested as Judge, to hear, try and determine, and make and enter judgments or orders in any cases, civil, criminal or probate, or any other matters that may be called to his attention by the attorneys in said court, while at Basin, Wyoming, during the February, A. D. 1936 term of said court."

On April 9, 1936, the report and petition of the commissioners above mentioned came on for hearing before Judge Ilsley. The objections of some of the objectors were sustained in whole or in part. The assessment

roll submitted to the court was rejected, the court holding that the rule adopted by the commissioners in making the assessments was erroneous, but the commissioners were authorized to re-classify the lands in the district and to make reassessments. That was done, and an amended report was filed by the commissioners of the district on August 19, 1936. By order of Judge Metz, this amended report was set for hearing on September 11, 1936, and notice of the filing of the report was ordered to be given. On September 11, 1936, certain objectors, 50 in number, most of them appellants herein, filed a motion, supported by affidavit, asking for a change of judge in the cause, alleging that Judge Metz was biased and prejudiced. Like objections were made to Judge Thompson, Judge of the First Judicial District. Thirty or more objectors did not join in the motion. Thereafter on September 22, 1936, Judge Metz entered an order, making a general assignment of all matters in Big Horn County, in the same manner as previously, assigning them to the Hon. V. J. Tidball, Judge of the Second Judicial District. On September 11th, the objectors, appellants herein, filed their objections to the amended report, and on the same day filed their objections to the jurisdiction of the court, on the alleged ground that Judge Metz had no authority to set the amended report for hearing, and on the further ground that the matter could only be heard by Judge Ilsley, who sat in the hearing of the report filed in March, 1936. The amended report came on for hearing before Judge Tidball on October 28, 1936, who proceeded to hear and determine the matter. The objections to jurisdiction were overruled. The court approved and confirmed the amended assessment roll, fixing assessments for benefit at $2,305,124.61, and assessments for construction at $866,340.54, approved the contract with the Government of the United States, and the issuance of bonds in accordance therewith, and

authorized the construction of the project. A motion for a new trial was filed, but was overruled, and all parties thereafter, seemingly, acquiesced in the judgment entered by Judge Tidball.

Thereafter, on April 21, 1937, the commissioners of the district filed a petition for revision of the order entered by Judge Tidball in certain particulars, which will be mentioned hereafter. On the same day Judge Metz entered an order setting the petition for hearing on May 5, 1937, and directing notice to be given. On April 27, 1937, Cicero Avent, one of the objectors and appellants herein, filed a motion, supported by his affidavit, for a change of judge, alleging that Judge Metz was biased and prejudiced. The same objections were made to Judge Tidball. On May 4, 1937, the appellants filed their objection to the jurisdiction of the court, reiterating the objections heretofore mentioned and that Judge Metz had no jurisdiction to make the order of April 21, 1937, setting the petition for revision for hearing. On May 19, 1937, an amended objection to the jurisdiction was filed, similar in effect. On May 7, 1937, appellants filed objections to the petition for revision. On May 18, 1937, Judge Metz, by general assignment in the manner above mentioned, assigned the cause to Judge Ilsley. That matter came on for hearing before the latter on May 19, 1937. The objections and amended objections to the jurisdiction were overruled, whereupon, on May 25, 1937, the appellants served a notice of appeal from this order. A motion that the commissioners should make their petition for revision more specific was overruled. Thereafter the matter came on for hearing before Judge Ilsley upon the merits of the petition for revision, and judgment was rendered, dated June 8, 1937, filed June 9, 1937, and entered June 12, 1937, generally granting the prayers of the petition. From the judgment so entered, the appellants

have appealed, notice of appeal having been served on July 6, 1937.

1. A number of matters are stated or argued by counsel for the appellants which we cannot consider. Thus, they say that the history of the district herein presents one of the blackest chapters in the litigation in Big Horn County; that the only reason why the matter is pending now is that interested parties desire to get something for nothing. They forecast an unfortunate future for the district. We can but trust that their predictions will not come true, and that, although many irrigation districts in the United States have become bankrupt, this district may prove to be one of the exceptions. While we appreciate that an apparently gratuitous grant from the Federal Government is apt to entice parties to enter into obligations which they would not otherwise do, this court cannot stop them by reason of that fact alone. We have no power to arrogate to ourselves the right to become the economic or financial guardian of the district. We must be content with the humbler duty, imposed upon us by the Constitution, of declaring the law as we see it, just as we did in the case of Arnold v. Bond, 47 Wyo. 236, 34 P. (2d) 28, which involved a similar gratuitous grant.

2. Counsel for appellants maintain that when the first motion for a change of judge was filed, on April 3, 1936, Judge Metz lost all jurisdiction over the case, except to refer it to some other district judge, that he had no right thereafter to set any proceeding in the case for hearing or refer it to Judge Tidball; that, accordingly, all steps taken in the case after the judgment of Judge Ilsley on April 9, 1936, are absolutely void. Counsel for the commissioners of the district contend that no change of judge is permitted in proceedings like that at bar. That is the important point in the case. Sec. 89-1101, Wyo. Rev. St. 1931, provides that "whenever either party to a civil action in any district

court of the state shall file an affidavit in the case, stating * * * that the person making the affidavit believes that on account of the bias or prejudice or interest of the presiding judge, he cannot obtain a fair trial," some other judge must be called in to preside at the trial of the case. Counsel for the commissioners contends that this is not a civil action, and that, doubtless, is true. Counsel for appellants themselves refer to the proceeding in the case at bar as a special proceeding, and such it doubtless is. The distinction between a civil action and a special proceeding was discussed at considerable length in the case of Anderson v. Englehart, 18 Wyo. 196, 106 Pac. 571, and we need not do so again in this case. Proceedings for the establishment of an irrigation district and those connected therewith have been referred to as proceedings in rem. 67 C. J. 1300. In Knowles v. Irr. Dist., 16 Ida. 235, 101 Pac. 87, they were referred to as special proceedings in rem. In Johnson v. Swanson, 50 S. D. 448, 210 N. W. 662, it was held that a proceeding to exclude territory from an existing school district is a special proceeding. Proceedings in connection with the organization of a drainage district have been held to be special proceedings, or proceedings in rem. 19 C. J. 337; Lupkes v. Town, 157 Minn. 493, 196 N. W. 666; Jackson & E. Ry. Co. v. Burns, 148 Miss. 7, 113 So. 908. In the case of In re Drainage District, 22 Ariz. 48, 205 Pac. 806, they are called "statutory proceedings." In the case of Watson & Co. v. Sullivan, 5 Oh. St. 42, the court said:

"Section 3 of the code abolishes the distinction between actions at law and suits in chancery, and substitutes in their place but one form of action called civil action. The commissioners in their report to the legislature under this section say: 'A civil action, under this code, will comprehend every proceeding in court heretofore instituted by any and all forms hereby abolished. Every other proceeding will be something else

than an action—say a "special proceeding." ' By section 604 of the code (Sec. 89-4827, Wyo. Rev. St. 1931) it is provided that the code shall not affect any special statutory remedy not heretofore obtained by action. The legislature seems to regard all proceedings not theretofore obtained by suit or action, as a special proceeding or special statutory remedy; and it would seem to follow that a provision in the code providing a proceeding not by action would be a special proceeding."

In the case of Anderson v. Caldwell, 91 Ind. 451, 454, it was said of a drainage district proceeding:

"We are inclined to the opinion that this proceeding is not a 'civil action' within the meaning of the Constitution. We think it is a special statutory proceeding, in which it is competent for the legislature to dispense with a jury."

Notwithstanding that decision, the Supreme Court of Indiana held in Bass v. Elliott, 105 Ind. 517, that the code of civil procedure may be made applicable in matters not mentioned in the statute providing for the organization of drainage districts, and that hence such proceeding may be considered a civil action within the spirit of the statute providing for a change of venue or of judge, so that it was not error when a change of judge was granted. See note, 102 A. L. R. 397-401. In the case of State ex rel. v. Riley, 203 Mo. 175, it appeared that the statute permitted a change of judge in "civil suits." It was held that that term is broader than the term "civil action," and that hence a change of judge in a drainage district proceeding should be allowed upon the filing of the proper affidavit. The Missouri case cited is not in point. We cannot follow the Indiana case on account of the diversity of statutes. Section 89-4827, Wyo. Rev. St. 1931, provides:

"Unless it is otherwise provided, or the legislature may hereafter otherwise provide, the code of civil procedure shall not affect proceedings to assess damages for private property taken for public uses, nor the proceedings under the statutes for the settlement of

estates of deceased persons, nor proceedings under statutes relating to apprentices, bastardy, insolvent debtors, or any special statutory remedy not heretofore obtained by action; but such proceedings may be prosecuted under the code of civil procedure whenever it is applicable."

In the case of Atlantic and Great Western Railroad v. Campbell, 4 Oh. St. 583, it was said of this section that it refers to forms of proceedings, and in Carter v. Krise, 9 Oh. St. 402, that it refers to the mode of proceeding. It cannot be claimed in this case that the form or mode of proceeding is in any way similar to that under the code of civil procedure, or could be *prosecuted* thereunder. The last clause of the section cannot, accordingly, mean that the parties have the right to pick out one particular right granted thereunder and make it applicable to a special proceeding, but would seem to mean that unless the proceeding can, as a whole, be substantially conducted as actions under the code of civil procedure, the provisions of that code have no application. Consideration of another statute and of our own decisions lead to the same result. We stated in Tucker v. State ex rel., 35 Wyo. 430, 251 Pac. 460, that "changes of venue and of judges are purely statutory, and authority for the change of judge asked for in the proceedings in the case at bar must be found in the statutes of this state." That case involved a contempt. We referred to the fact that the statute then provided that an affidavit for a change of judge must be filed within thirty days after service of summons, and that, in view of the fact that no summons is issued or served in a contempt proceeding, the statute which refers to change of judges in civil actions could have no application. That holding would, of course, dispose of the contention of the appellants herein, if the statute were still the same as it was then. However, in 1927 the statute (Sec. 89-1104, Rev. St. 1931) was amend-

ed. The clause with reference to the service of the summons was omitted, and it was provided that the affidavit for a change of judge or of venue should be filed within five days before trial. The substitution, however, can have no significance herein, since it is plain why it was made. The change, in fact, strengthens our holding in the Tucker case, for the amendment further provided that "upon any controverted matter arising in a probate proceeding, a change of judge, or, in cases where a jury is demandable, a change of venue, or both, may be had for any cause authorizing such change in a civil action." The import of the addition is significant. No provision had previously been made for a change of judge or of venue in probate proceedings. The legislature in 1927 evidently recognized that such proceedings were special proceedings and not "civil actions," just as mentioned in Sec. 89-4827, supra, and that a change of venue or of a judge could be had only in such actions. Provision for such change was made for only one special class of special proceedings, leaving out all others. That would seem to require the application of the rule of "expressio unius est exclusio alterius."

The foregoing conclusion is strengthened when we come to consider another rule. There are difficulties in a case like that at bar in applying the law of change of venue or of a judge justly. There are too many conflicting interests. There is no justice in letting one party or group of parties control the proceeding. Under our statute "either party" may file an affidavit for a change of judge or a change of venue. The term "party" in such a statute is generally construed in a collective sense and, aside from what we have said, the rule, supported by the overwhelming majority, and directly applicable in the case at bar, is that in cases in which there are two or more persons interested as parties plaintiffs or defendants, they must all join in

the application for a change or it will not be permitted. 67 C. J. 141. The rule has its exceptions. It should not apply, for instance, where a joint party is in default, or is merely a nominal party, or is absent so that his consent cannot be obtained, and perhaps in other cases. We cannot think of any exception which should apply in the case at bar. In Wolcott v. Wolcott, 32 Wisc. 63, the court stated:

"Where there is but one plaintiff or one defendant making the affidavit and application, or where there are several plaintiffs or several defendants, all of whom join therein, there can be no difficulty. In all such cases the change of venue must be awarded. But cases may arise in which some of the plaintiffs or some of the defendants make the application, and the balance of them are opposed to the application, or do not join therein. What is the proper rule in such case? Suppose one of two plaintiffs makes the required affidavit of the prejudice of the judge, and applies for a change of the place of trial, and the other plaintiff does not join in the application, but prefers that the case be tried in the court in which it was commenced. In such case the rights of the plaintiff who does not join in the application are certainly equal to those of his co-plaintiff, and it seems very clear that the statute ought not to be so construed as to give the latter the control of the action in this particular, to the exclusion of the former."

In the case of State v. Gore, 32 Md. 498, the court said:

"The term 'party,' as employed in the Constitution, Article 4, section 8, and the Act of 1868, ch. 180, to regulate and give force to the Constitutional provision, when applied to civil causes, must be taken in a collective and representative sense, where there are more persons than one as plaintiffs or defendants, and, therefore, as there can be no severance, all applications to remove in such cases must be taken as made on behalf of all the persons constituting the party—plaintiffs or defendants, as the case may be. Any other construction would work the greatest inconvenience, if not, in many cases, a total defeat of all trial. For, if there should

happen to be more individual defendants to a cause than there are judicial circuits in the State, (a thing of not unfrequent occurrence,) and each defendant had a separate and consecutive right of removal, as is claimed in the present instance, by electing to remove to a different circuit from that in which the cause might be at the time depending, as could be done, it is easily seen how justice could be defeated, and the whole judicial power of the State put at defiance, by such a device. Certainly, the framers of the Constitution never contemplated a construction of the clause in regard to removal of causes that *could* lead to such a result. If, in the cases before us, the individual defendant, whose application was gratified by the Circuit Court for Frederick County, has the right to remove, the right equally exists to the remaining defendants; and they may each exercise the right, and, before these cases can be brought to trial, they may find their way into nearly every judicial circuit of the State, as there are seven defendants in each cause. Seeing to what consequence the construction contended for leads, we cannot, for a moment, suppose it to be sound."

In the case of Whitaker v. Reynolds, 14 Bush. (77 Ky.) 616, the court said:

"Thus we see that *parties,* as used in the statute, refers to the two classes of litigants, both plaintiffs and defendants, and embraces them both, and the word *party* refers to one class of the litigants, that is the plaintiffs or defendants. According to the argument of the counsel for appellees, if one of the defendants in an action, where five are sued, makes the affidavit and proof that he can not get justice in the court where he sued, he can drag four of his co-defendants for trial into a county where they are equally confident they can not get justice. We think that such a construction of the statute would be opposed to any fair deduction from its provisions, and although we confess that the legislative intention is not made as manifest as it perhaps should have been, we conclude that the most just and reasonable interpretation of the statute is that it contemplated each class of the litigants as a party, in motions for change of venue, and if the suing class wishes such change it must apply in a body for it, and

so with the sued class. If one litigant can, because there is undue prejudice against him in a county, change the venue and force four of his co-defendants against their will into a trial in a county where there is undue prejudice against them, then the statute which must have been intended to subserve the ends of justice would have precisely the contrary effect."

In the case at bar only part of the objectors joined in the motion for a change of judge. Those who, in a case like that at bar, do not want such change may have objection against the very judge desired by the others. If the proceeding against each of the several parties interested were considered a separate proceeding so far as he is concerned, there is no reason to deny him the right of objecting to the judge against whom some other of the several persons interested have no objection. Thus it might well happen that each of the trial judges of the state would have to be called into the case. That the statute did not contemplate such a situation is, we think, clear. The contention as to the lack of jurisdiction herein must, accordingly, be overruled.

3. The foregoing conclusion necessarily eliminates from consideration the matters argued in the brief of counsel for appellants which relate to the judgment of Judge Tidball. That judgment is not before us, except in so far as it may have a direct bearing on the matters involved in this proceeding. It is the final adjudication as to the assessments and other matters directly involved therein. Whether it is inconsistent with the first judgment of Judge Ilsley or not, or whether the latter was res judicata as to matters determined in the latter or not, are matters which cannot be considered here, but should have been litigated in connection with the judgment entered by Judge Tidball. The only matters, in view of what we have said on the question of jurisdiction, which we have before us and which were before the trial court, are those matters therein which

are sought to be modified under the petition for revision of April 21, 1937. The right to such modification is claimed to be given under Section 122-721, Rev. St. 1931, which reads as follows:

"Said order of confirmation may, at the same or at any subsequent term of said court be revised, modified or changed, in whole or in part, on petition of the commissioners, after such notice as the court may require to parties interested. At any time prior to making the order confirming said report or thereafter, the court may permit the commissioners to present and file a supplemental report, or amend their report, as to any matter which, pursuant to the provisions hereof, was or might have been included in the original report presented by them, and after reasonable notice given to all parties interested, in such manner as the court shall direct, the court may, upon the hearing in said matter make such order as the case may require."

The matters mentioned in the petition for revision (stated in greater detail hereafter) relate to the contract with the United States Government; to a contract for rights of way for the reservoir and ditches to be acquired by the district; to the employment of a consulting engineer; and to contracts for the carriage of water for the district. Counsel for the district has suggested that these matters were not necessary to be submitted to the court and did not need its approval. We shall not decide that point. The district has asked such approval, and we are satisfied that if it was needed, it might be asked and granted, if proper, under the provisions of Section 122-721, which provides for a modification of the original order of the confirmation of assessments as to any matter which "was or might have been included" in the report upon which such order is based.

4. As heretofore stated, the district entered into an agreement with the Government of the United States as of date April 23, 1935, under which, in substance,

the latter agreed to purchase the bonds of the district in the principal sum of $845,000 at the rate of four per cent per annum, the principal to be payable in installments, and further to make a grant to the district. In other words, the Federal Government in substance offered to buy the bonds at a heavy premium. The conditions of the contract not having been fulfilled, but the Federal Government being still willing to continue its contract, a new contract was negotiated in 1937 with certain conditions, and the district, in the petition for revision filed April 21, 1937, asked the court for permission to comply with these conditions. Before mentioning what these conditions are, we must dispose of some general contentions of the appellants. They assert that the district could not enter into any such contract without submitting it to an election of the property owners of the district in accordance with Section 122-713, Rev. St. 1931. That section provides that the "board may contract with the United States for the construction, operation and maintenance of the necessary works for the delivery and distribution of water therefrom under the federal reclamation act," but must before doing so submit it to the electors of the district for approval. These provisions have no application in the case at bar. The Federal Government in this case is not constructing anything for the district. It is a lender and giver of money. If that be so—it is argued by counsel for appellants—then the commissioners of the district must be contracting with the Federal Government "by virtue of the duties and powers given the commissioners" under Section 122-713, supra. Counsel seem to contradict themselves, for they contend further that the contract is ultra vires. The section just mentioned provides that "the board shall have power, and it shall be their duty, to adopt by-laws, manage and conduct the affairs and business of the district, make and execute all necessary contracts, em-

ploy such agents, attorneys, officers and employees as may be required, and prescribe their duties, establish equitable rules and regulations for the distribution and use of water to and upon the lands of the district." Under Section 122-738 "the presumption shall be in favor of the regularity and validity of all their official acts." Section 122-731 provides that "the commissioners may borrow money, not exceeding the amount of 'assessment for construction' as herein provided, unpaid at the time of borrowing for such purposes, or for the payment of any indebtedness they may have lawfully incurred, and may secure the same by notes or bonds bearing interest at a rate not to exceed six per cent per annum * * * which said bonds shall not be sold at less than ninety per cent of their face value" etc. It may be noted from the foregoing provisions that the powers granted the commissioners are extensive, and that their contracts are presumed to be valid. Counsel have not pointed out wherein the amended contract here in question is ultra vires. They refer, it is true, to a provision of the original contract. That, however, was approved by the judgment of Judge Tidball, which is not involved in this case. However, we may mention the main contention in that connection. The original contract provides that the bonds should be special obligations of the district payable as to both principal and interest from and secured by an exclusive *first* pledge of assessment levied upon all lands, etc. It is said that such assessments are under the statute inferior to general state, county, city, town and school taxes. The Federal Government must be aware of these provisions of the statute; the contract was doubtless entered into with them in mind; its bonds will unquestionably be subject thereto. We cannot see how the provision mentioned can be prejudicial to the interests of the property owners of the district. The Federal Government takes all the risk in that connection. Other

provisions of the original contract, and in the amended contract here under consideration, relate to certain conditions which the government wants complied with before purchasing the bonds and making the grant. The government, of course, as the lender and giver, has the right to attach such conditions as it desires. The commissioners, having the power to borrow money, and issue the bonds of the district, clearly had the power to enter into a contract for the purpose of securing such money. It cannot be held to be ultra vires, unless, perchance, some of the provisions thereof were violative of some statute. The commissioners had the right to meet all conditions made by the United States Government, at least if not unreasonable, and if not in conflict with the laws of the state. The conditions attached tend, generally speaking, to the end that the project in question may be completed in such a manner that the bonds to be issued will be of value. To have a project— an irrigation system—of the greatest possible value, is, of course, of the greatest interest to the district as well as to the Federal Government as the lender of money. No statute has been pointed out in this connection which has been violated, nor have counsel directed our attention to any provisions of the contracts which were unfair to the extent that the unfairness might become a question of law.

5. As already stated, the decree entered by Judge Tidball provided that the district might sell its bonds to the United States Government in the sum of $845,000, to draw interest at the rate of 4% per annum, to be dated on June 1st, 1935, or some other date agreed on, and to become due in certain installments, the last to fall due on June 1st, 1966. Subsequently it was desired, pursuant to the amended contract in question, that the bonds should be dated January 1st, 1937, the first installment to become due in 1941, instead of 1940, and the last installment to become due on January 1st,

1967. The petition for revision herein asks that the change of dates so mentioned be approved. The court gave its approval. We can see no error in this respect. Counsel for appellants have not shown that any prejudice would result from this action of the court, nor is there any statute so far as we can find which would in any way be violated thereby.

6. The original contract with the Government of the United States provided in subdivision (h) of Section 28, as one of the events which would release the government from buying the bonds or making a grant:

"If the borrower shall not furnish evidence satisfactory to the Administrator of its rights and ownership of permits to divert waters *from* the project and all other permits required" etc.

The parties agreed, pursuant to the amended contract in question herein, that the words "for" should be substituted for the word "from" italicized above. It is apparent that this involves the correction of a merely clerical error, and the permission by the court to make it was, of course, necessarily right.

7. The amended contract here in question further provides that the Federal Government should not be obligated to buy the bonds or to make a grant, if the district should not have entered into a contract with each of the several canal companies serving the lands within the district for the carriage and distribution of the water from the reservoir of the district and establishing the maximum tolls or charges, if any, for such carriage and distribution, or if the district should not have submitted to the administrator, prior to inviting any bids for the construction of the project, revised plans and specifications for the proposed dam and appurtenances approved by a board of consulting engineers employed by the district. The commissioners of the district, accordingly, ask in the petition for revision

that it be permitted to enter into such contracts with the canal companies above mentioned, and to employ such board of consultant engineers to comply with these demands of the Federal Government. The court approved the foregoing conditions and authorized the commissioners to comply therewith, however limiting the cost of the board of consulting engineers to the sum of $3500. We do not think the court erred. The conditions do not appear to be in violation of any statute. In fact we do not find that counsel in their brief question the action of the court in this connection except in the following particular: The record shows that the district heretofore, on December 5, 1935, entered into a contract with the Taggart Construction Company to do some portion of the construction work in connection with the instant project. But no money was then available, and nothing has, apparently, been done by the construction company under its contract. Counsel for appellants state that the amended agreement with the government, to the effect that the district would, before inviting any bids, submit a revised plan by the board of consulting engineers, means that the district will violate its contract with the Taggart Construction Company, and thus give rise to an action for heavy damages. We fail to see how any question of law is presented to us by reason of the foregoing fact. Without mentioning other matters, we need but say that the contract of the Taggart Construction Company is not in the record. For aught that appears ample provisions may be contained therein which shield the district from any action for damages.

8. The commissioners of the district ask in the petition for revision herein for authority to enter into a contract—in brief called the Phelps contract—for the purpose of acquiring lands for the proposed reservoir and other necessary rights of way. A proposed contract was submitted to the trial court. Under it the

district intends to construct its main reservoir, called the Sunshine Reservoir, in Section 11 and other sections of Township 47, R. 102 West of the 6th P. M. It intends to conduct into the reservoir water from the Greybull River. The intake, that is to say, the diversion dam and headgate, is to be located in the NE-¼ of the NE-¼ of Section 30, Twp. 48, R. 102, and the water is to be conducted to the reservoir through what is called the Supply Canal, which is a number of miles in length. The district proposes to pay to the owners of the lands which is necessary to be taken, the sum of $10,000, which includes damages to the lands of the owners, and also the sum of $12.50 per acre for grazing land taken, and the sum of $60 per acre for farm land necessary to be taken. Provision is made for the construction of fences, roads, repair and other matters. Some of these need not be set out. Others, to which specific objections are made, will be mentioned hereafter. A great deal of evidence was taken on this matter, and the trial court, after modifying some of the proposed terms, gave its approval to the contract. Appellants claim that the contract is ultra vires. Of course, the very end of the organization of the district is to build a reservoir and store water, and hence it must have the power to obtain rights of way and lands otherwise necessary. Ample power to obtain these under contract is given, we think, by Section 122-713, supra. Hence, appellants probably mean to limit their objections above mentioned to certain features of the proposed contract, to which specific objections are made, and which we shall now proceed to consider.

(a) The proposed contract, as approved by the court, provides that the district shall be responsible for all damages caused by water from its spill-ways or by breaks in, or seepage from, its irrigation works. Appellants argue that damages caused by an act of God should have been excepted. We agree that such excep-

tion would be advisable, even if not necessary, and would probably, on the whole, be in the interest of all of the parties. But we fail to see how that fact presents a question of law for this court. The point involves only the fairness of the contract, considered as a whole. That was determined by the trial court upon conflicting testimony, and it has not been pointed out how we can interfere with its conclusion. The fact, if it be a fact, that the provision mentioned might lead to some possible future litigation would not give us authority to reverse the finding of the trial court.

(b) The district also undertakes by the foregoing agreement as follows: "(g) to convey to Eugene Phelps, 34-½ acre feet of storage capacity in said reservoir to be used on the Whitney place, the same to be delivered at the outlet of this reservoir of the district, said Whitney place being described as follows" (here follows the description, situated outside of the boundaries of the irrigation district), "the above described storage capacity to be subjected to annual operation and maintenance charges and assessments only"; "(h) to convey to Eugene Phelps, 1-½ acre feet of storage capacity in said reservoir to be used on said Whitney place, the same to be delivered in the outlet of the reservoir of the district for each irrigable acre of land destroyed or used by said district in the construction of its irrigation works outside of said right of way hereinbefore described." The trial court required an amendment to subdivision (h) above mentioned, limiting the total to 15 acre feet, thus making the maximum amount to be conveyed 49½ acre feet. The objection, accordingly, that the amount is uncertain, is not well taken. The appellants contend that these provisions relate to a water right, the commissioners of the district assert that they refer merely to storage capacity and not to storage water. We do not think that we are called on to determine the meaning of the

contract. Whether it means one thing or another involves merely the question as to whether the district's burden is greater or smaller; in other words, as to whether or not, taking into consideration the contract as a whole, the provision is fair. What we have already stated on the question of fairness applies in this instance, unless it can be said that the provisions are illegal. Appellants claim that they are illegal, on the ground that the district has no power to construct storage capacity for, or to give water to, any party whose lands are not within the irrigation district, which appears not to be true in the case of the Whitney lands above mentioned. There are no statutory provisions, so far as we know, which specifically cover this point. See generally on the subject, 67 C. J. 1396. It appears that the total storage capacity of the proposed reservoir is for 50,000 acre feet, and that a storage capacity of 43,000 feet is allocated to the landowners of the irrigation district, leaving 7000 acre feet of storage capacity which the landowners of the district do not need. Sec. 122-1605, Rev. St. 1931, provides:

"The owner or owners of a reservoir impounding a greater quantity of water than the owner or owners thereof necessarily use for irrigation and other beneficial purposes in connection with their own lands shall, when application is made to them for that purpose, furnish such surplus water at reasonable rates to the owners of land lying under and capable of being irrigated from such reservoir for the purpose of irrigating and rendering the same productive, and maintaining their productiveness, and in case of refusal to do so, the owner or owners of such reservoir may be compelled by proper proceedings to furnish such water on such reasonable terms as to the court may seem meet and proper."

Section 122-725, too, contemplates that the district may dispose of surplus water. These statutes are in line with what we have heretofore held to be a funda-

mental principle and policy under the irrigation law, that all the available water supply should be used as far as possible. Van Tassel Real Estate & Live Stock Co. v. Cheyenne, 49 Wyo. 333, 54 P. (2d) 906; Wyoming Hereford Ranch v. Hammond Packing Co., 33 Wyo. 14, 236 Pac. 764. The statute and the principle mentioned have no direct bearing herein, but they have indirectly, for we are to determine whether the clauses in question are illegal, when we have no statute directly so declaring them, but when they clearly tend to carry out the general policy of the state above mentioned. There can, of course, be no doubt that the district is created primarily for the benefit of the property owners therein; and that is true in connection with the irrigation works of the district. It is further true that the district has only limited power, and that, accordingly, the giving of storage capacity, or water, to Phelps must be at least incidental to the direct powers of the district. It is apparent, however, that in construing these incidental powers we must take the general public policy of the state into consideration. In the case of Talbot v. Reclamation District, 154 Wash. 102, 281 Pac. 11, it appears that the district undertook, under a contract similar to that involved in the case at bar, to supply water to an owner whose property was not within the district. The district did not in fact have surplus water. On the contrary, there was a deficiency of supply. The Washington statutes provided that "no water * * * shall be furnished for use outside of said district until all demands and requirements for water * * * for use in said district are furnished and supplied by said district." The trial court, accordingly, in view of this prohibitive statute, declared the contract above mentioned to be void. The Supreme Court, however, reversed the judgment, stating as follows:

"Here, the district was seeking to obtain a supply

of water for its needs. In order to accomplish that purpose, they purchased from the appellants certain lands, certain water rights, and certain rights of way for water conduits through lands owned by the appellants, and as a part consideration for the property it acquired by the purchase agreed to furnish the appellants with a stated quantity of water at a stated price. The contract was one which the district was empowered to make, Id. Sec. 7429. (Rem. Comp. Stat.) Indeed, it would seem that the rights of the appellants could not have been acquired by any other means than by a voluntary contract of purchase. Id. Sec. 7354. But, perhaps, it is unnecessary to inquire whether the right of condemnation existed. As we say, it was within the powers of the district to acquire the property of the appellant by a voluntary purchase, and under no principle of law or equity can they retain the property acquired and at the same time refuse to comply with the agreement under which it was acquired."

The court in the foregoing case went much further than we need to go. Our statute, cited above, namely Section 122-1605, supra, is not prohibitive in terms. In the Washington case there was a deficiency of supply; in the case at bar there is a surplus of storage capacity. The use of the extra capacity is in line with the general policy of the state and the statutes. The reservoir containing such surplus capacity will be in accordance with the contour of the ground. It could probably not be constructed except as planned. Even if constructed for the benefit of Phelps, that would be done as part consideration of the contract under which the district receives lands and other property necessary for its purpose—a contract which the district is authorized to make. The construction would be undertaken to take the place of an outlay of cash. We see no reason why the district should not be permitted to do so. A case upholding that right, and which is perhaps even more closely in point herein, than the Washington case, is Kearny v. Bayonne, 90 N. J. Eq. 400, 107 Atl. 169, in which it appears that a municipality contracted

to furnish water to a party outside of the limits of the city in consideration of the grants of rights of way. The court in upholding the contract stated:

"A municipality, having power to enlarge its plant, to relocate its pipes, to acquire locations for such purposes, and to enter into contracts which may be necessary to carry out the purposes of supplying its inhabitants with water may, I think, contract as part consideration for the grant to it of rights of way for its mains, to furnish water from such mains, to the owners or occupants of the tracts through which the rights of way run. The Court of Appeals of New York in People ex rel. City of Rochester v. Briggs, 50 N. Y. 553, in considering the authority of a municipality to furnish water to villages through which its mains ran, at page 563 of 50 N. Y. said: 'The power to supply villages with water by contract is incidental to the main purpose, and may serve as the means of attaining it.'"

We think, accordingly, in accordance with the foregoing reasoning, and upon the authorities cited, that the contention of appellants in this connection must be overruled.

(c) The proposed contract provides that the district undertakes "to agree for any irrigation season requested by the owners to the rotation of water, including the exchange of stored flow for stream flow so as to carry out such rotation agreement in order that the owners may irrigate their property at the most advantageous season of the year to them." Appellants state that "this provision is in derogation of state law. * * * There is an established procedure for procuring permits for such rotation. The district here contracts to do a thing they may never be able to do. Should permit be procured, such provision is ultra vires. It is prejudicial to the other users in the district. No amount is fixed. It is unconfined and vagrant, and subject to cessation by any member of the district." We are inclined to think that appellants somewhat misun-

derstood the foregoing provision of the contract, although, as they say, it may lead to litigation. The legislature in 1927 passed a law (Sec. 122-428, Rev. St. 1931) providing for the exchange of stored water for stream water, upon an equal footing. Section 122-429 requires an application for such purpose to be filed in the office of the state engineer. The exchange is actually made, after such application has been made, by the water commissioner. Section 122-430. We are inclined to think that the proposal above mentioned implies an even exchange, and not a disproportionate one. The district merely undertakes to *agree* to such exchange. If the water commissioners will not, for any reason, actually make it, or if by reason of the fact that the district is otherwise prevented from making it—for instance by reason of a suit of an interested party who will be prejudiced by such exchange—the district will not, we think, be responsible, for it does not undertake to effectuate the exchange. In other words, it would seem that all that the provision means is that the district will offer no objection to the rotation and exchange.

A motion was heretofore filed and argued in this case to dismiss the appeal. In view of the fact that appellants presented the question of jurisdiction, we have deemed it best to decide the case on its merits, and leave the motion to dismiss undecided. From what we have said, it follows that the judgment of the district court should be affirmed, and it is so ordered.

*Affirmed.*

RINER and KIMBALL, JJ., concur.

## ON PETITION FOR REHEARING

PER CURIAM.

A petition for rehearing has been filed herein. We shall make reference to most of the points mentioned

therein and in the brief accompanying it. Objection has again been raised to the fact that the priority of state, county, city, town and school taxes has not been sufficiently protected. We mentioned this matter in the original opinion and stated that our statutory provisions govern, and that the contract between the district and the Federal Government was doubtless entered into with them in mind. We presume that when the bonds of the district are issued, they will be issued in accordance with the statute. We cannot presume that the statute will be disregarded.

It is stated that the judgment entered in the cause by Judge Tidball made the requirement that the proposed contract for the right of way for the intake canal should be submitted to the court. That requirement was complied with. It relates to the so-called Phelps contract, involved in the instant proceeding, was fully passed on by Judge Ilsley and was fully discussed in the original opinion herein.

Judge Tidball also required the commissioners to amend their plans and specifications in such manner that they would provide for lining surface croppings of sand stone lying below the high water mark of the reservoir of the district, in accordance with the recommendation of Dr. H. S. Knight. This matter does not appear to be involved in the matter appealed from herein. In any event, we cannot presume that the commissioners will violate the orders of Judge Tidball. The last mentioned order may already have been complied with, or will be complied with.

Other matters argued seem to relate to the first judgment of Judge Ilsley. These matters might, perhaps, have been raised before Judge Tidball, but cannot very well be raised here. We pointed out in the original opinion that the matters before this court are limited

in scope, and we believe that all within that scope were discussed in detail in the original opinion, and we need not add anything further here.

We find no reason for rehearing, which, accordingly, must be denied.

*Rehearing Denied.*