IN THE MATTER OF THE OWL CREEK IRRIGA-
TION DISTRICT,

THE OWL CREEK IRRIGATION DISTRICT, and L.
F. THORNTON, FRED E. OSTBERG, and ELMER
TANNER, COMMISSIONERS OF THE OWL
CREEK IRRIGATION DISTRICT,

*Petitioners and Respondents,*

vs.

FRED BRYSON, WALTER COLLINS, LEWIS
FREUDENTHAL, ET AL.,

*Objectors and Appellants.*

(No. 2557; February 17th, 1953; 253 Pac. (2d) 867)

For the objectors and appellants the cause was submitted upon the brief and also oral argument of Milward L. Simpson of Cody, Wyoming, and Joseph Cavalli of Thermopolis, Wyoming.

For the petitioners and respondents the cause was submitted upon the brief of Goppert & Fitzstephens of Cody, Wyoming, and Axtel & Yonkee of Thermopolis, Wyoming and oral argument by Mr. Ernest J. Goppert.

## OPINION

RINER, Justice.

This case presents a direct appeal from a judgment or final order of the District Court of Hot Springs County which undertook to enlarge the boundaries of an Irrigation District hereinafter referred to as the "District" which had theretofore been established. The original district boundaries had been defined by an order of the district court aforesaid on March 9, 1935, pursuant to the provisions of Article 7 Revised Statutes of Wyoming, 1931, (now substantially Article 8 §§ 71-801 to and including 71-847 W.C.S. 1945).

On October 26, 1937, the Commissioners of the District filed an amended report and petition and after notice to the landowners in the district thus formed— pursuant to an order made by the District Court aforesaid that court by its order again fixed the boundaries of the district, but, however, excluded from the total area the lands of most of the objectors who now appear as the appellants in the instant proceeding without prejudice to any later petition for the inclusion of said excluded lands after "Notice of Hearing as provided by law." The district by location, crops and altitude naturally divides itself into three distinct areas, viz.: the lower or Lucerne, the middle and the upper areas. A majority of the objectors here live in what is usually designated as "the upper area." These distinctions will be observed herein as may be found necessary.

The present Commissioners are L. F. Thornton, Fred E. Ostberg and Elmer Tanner. The lands of all the appellants are now by a court order—the one appealed for review—embraced within newly changed district boundaries. These Commissioners were, after several hearings, authorized by the court to negotiate a contract with the Bureau of Reclamation of the United States through the Secretary of the Interior. That contract is attached to a Supplemental Petition as Exhibit "A". The objectors filed in opposition to the Supplemental Petition what was designated as: "Answer and Objections to Supplemental Report and Petition for Modification and Changing of Orders and Confirmation of Contract and Assessments." This Answer and Objections was interposed to the "Supplemental Report and Petition for Modification and Changing of Orders and Confirmation of Contract and Assessments" which had been previously filed in the court aforesaid on June 6, 1950, by the respondent, Owl Creek Irrigation District, through its three Commissioners named above.

The substance of these pleadings is altogether too extensive and involved to undertake to reproduce here.

Hearings were had on these pleadings commencing on September 18, 1950, and with various continuances extended until December 1, 1950; at their conclusion the district court aforesaid entered the order which is now brought here before us for review, the entry of that order being made on December 8, 1950. It, among other things, found generally in favor of the petitioners and undertook to enlarge the district boundaries so as to include the lands of all of the objectors in the upper area which had previously been omitted, and confirmed and approved the contract aforesaid made between the United States of America through its Secretary of the Interior and the Owl Creek Irrigation

district through L. F. Thornton, Chairman of the Board, and Fred E. Ostberg, its secretary. This contract about which the controversy before us largely centers reads as follows:

"UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Owl Creek Unit, Wyoming
Missouri River Basin Project

CONTRACT BETWEEN UNITED STATES OF
AMERICA AND OWL CREEK IRRIGATION
DISTRICT

Table of Contents

| Article | Title | Page |
|---------|-------|------|
| 1-5 | Explanatory Recitals | 1-2 |
| 6 | Definitions | 1-3 |
| 7 | Construction of Works | 3 |
| 8 | United States to Release and Pump Water | 3-4 |
| 9 | Payment by the District | 4-5 |
| 10 | Assessment of Lands | 5 |
| 11 | Delivery of Water | 6 |
| 12 | Agreed Charges A General Obligation of the district | 6 |
| 13 | Levy of Assessment, Tolls and Charges | 6 |
| 14 | Penalty for Delinquent Payments | 6 |
| 15 | Defaults | 6-7 |
| 16 | Application of Payments | 7 |
| 17 | District to Include All Project Lands | 7 |
| 18 | Confirmation of Contract | 7 |
| 19 | District to Secure Agreement by Individual Water Users | 8 |
| 20 | Transfer of Title to Certain District Works | 8 |
| 21 | Payment of Indebtedness | 8-9 |
| 22 | Lands not to Receive Water Until Owners Thereof Execute Certain Contracts | 9 |
| 23 | Valuation and Sale of Lands | 9-10 |
| 24 | Excess Lands | 10-11 |
| 25 | Rules and Regulations | 11 |

40

26  Changes in District Organization—Assignment Limited—Successors and Assigns Obligated ........................................... 11
27  Notices ................................................................... 11
28  Discrimination Against Employees or Applicants for Employment Prohibited.. 11
29  Contingent on Appropriations or Allotments of Funds ........................................... 12
30  Officials Not to Benefit ........................................... 12

"UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Owl Creek Unit, Wyoming
Missouri River Basin Project

"CONTRACT BETWEEN UNITED STATES OF
AMERICA AND OWL CREEK IRRIGATION
DISTRICT

"1. THIS CONTRACT, made this .......... day of .................., 19......, between THE UNITED STATES OF AMERICA (hereinafter called the United States), acting through the Secretary of the Interior and pursuant to the Federal Reclamation Laws, and the OWL CREEK IRRIGATION DISTRICT (hereinafter called the District), an irrigation district organized and existing under and by virtue of the laws of the State of Wyoming, with its principal place of business and office in the City of Thermopolis, Wyoming, witnesseth,

"2. Whereas, the farmers and ranchers irrigating lands along Owl Creek have learned by experience and competent technical analysis and advice:

(a)  That an ample water supply is not available for the approximately thirty thousand (30,-000) acres of land claiming water from Owl Creek;

(b)  That in a representative water period such as 1930-1948, and in similar periods, the annual average water supply is only sixty (60) percent of water needs for the approximately seventeen thousand five hundred (17,500) acres of land cultivated;

(c) That such water supply shortages frequently cause acute economic distress.

"3. Whereas, the United States is constructing the Missouri River Basin Project pursuant to the Act of December 22, 1944 (58 Stat. 887), and the District desires that the United States construct the Owl Creek Unit of this project for the purpose of assuring a better water supply for the irrigable lands within its District boundaries;

"4. Whereas, the United States has determined, as a result of extensive engineering and economic investigations, that a more nearly adequate water supply can be assured the Owl Creek farmers and ranchers by the construction of the Owl Creek Unit, provided:

(a) The Unit, upon construction, is operated and administered strictly in accordance with the beneficial use and other applicable requirements of the laws of the State of Wyoming;

(b) The acreage irrigated does not exceed that for which there will be an available water supply. According to hydrologic studies it is estimated that the waters of Owl Creek will only be sufficient under proper control measures, to irrigate approximately 13,000 acres, or the acreage normally and now being partially irrigated in the area of the unit which will not be served by the Lucerne Pumping plants;

(c) The diversion requirement averages 3.06 acre-feet per acre with variations from the average based on current weather reports and forecasts, snow surveys, and other pertinent data and information;

(d) The Unit is operated and administered so that the available water is distributed proportionately and equitably to all irrigated lands of the Unit;

"5. Whereas, there are included in the acreage of cultivated land two thousand two hundred ninety-two (2,292) acres owned by the Shoshone and Arapahoe Indian Tribes which may be served by the Unit works

and will not be a part of the Owl Creek Irrigation District.

"NOW, THEREFORE, it is agreed as follows:

## "DEFINITIONS

"6.  Where used in this contract, the terms:

(a)  'Secretary' shall mean the Secretary of the United States Department of the Interior, or his authorized representative;

(b)  'Federal Reclamation Laws' shall mean the Act of June 17, 1902 (32 Stat. 388), and all acts amendatory thereof and supplementary thereto;

(c)  'Year' shall mean the period January 1 through the next following December 31;

(d)  'Irrigation season' shall mean the period within any year from April 20 through October 10, subject to such change as shall be proposed and approved in the schedule below provided for in Article 8 (c).

(e)  'The Owl Creek Unit' shall mean the Anchor dam and reservoir the Lucerne pumping plant and appurtenant facilities. The plans for these features may be changed by the Secretary, but it is understood that they contemplate a reservoir of a capacity of approximately 16,500 acre feet and a pump capacity of approximately 84 cubic feet per second;

(f)  'Lucerne pumping plant' shall include the works instilled for pumping water directly from the Big Horn River and the works installed to re-lift a portion of such water to a higher level.

## "CONSTRUCTION OF WORKS

"7.  Construction of the Owl Creek Unit shall not, at the option of the United States, be commenced until the District has completed the action set forth in Articles 17, 18, 19 and 20.

## "UNITED STATES TO RELEASE AND PUMP WATER

"8.    (a)    The Secretary shall give the District notice when he has determined that construction of the Owl Creek Unit is sufficiently completed to permit the release and pumping of water from the works of the Unit for the irrigated lands of the District.

(b)    On March 1 following the giving of such notice and on March 1 of each of the following thirty-nine (39) years, the Secretary shall advise the District of the probable water supply for the ensuing irrigation season.

(c)    On each April 1 then following, the District shall submit to the Secretary a schedule showing the desired quantities of water to be released and pumped and the number of acres to be irrigated. The schedule shall be approved by the State Water Superintendent of Division No. 3, and subject to the approval of the Secretary.

(d)    The United States shall, as nearly as may be feasible, release and pump water in accordance with such schedule. The schedule may be varied to meet the needs of the District lands upon written request of the District approved by the Secretary and said State Water Superintendent.

(e)    Water shall be released to the District at the outlet of the Anchor dam and at the discharge sides of the main and relift stations of the Lucerne pumping plant.

(f)    The District shall be responsible for the control, handling, use, disposal, or distribution of water which may be released to the District below the points of release provided above in (e), and the District shall hold the United States harmless on account of damage, personal injury, or death arising out of or connected with the control, handling, use, disposal, or distribution of such water below said points of release.

(g)    On account of drought, inaccuracy of distribution, or other causes, there may occur at

times during any year a shortage in the water available for the lands of the District. In no event shall any liability accrue against the United States or any of its officers, agents or employees for any damage, direct or indirect arising out of such shortage. In any year in which there may occur such shortage, the District shall, in its schedule provided for above in (c), include a plan of equitable distribution of the water.

## "PAYMENT BY THE DISTRICT

"9. (a)  On April 15 of the year following the giving of the notice described above in paragraph 8 (a) and on April 15 of each of the thirty-nine (39) years then following, the District shall pay the United States a water service charge. During the first five (5) years following the giving of the notice, the water service charge, as announced by the Secretary, on or before March 15 of the year due, shall be the District's proportionate share of the estimated cost of operating and maintaining the Unit works. During each of the next thirty-five (35) years, the annual water service charge, as announced by the Secretary on or before March 15 of the year due, shall be the District's proportionate share of the estimated cost of operating and maintaining the Owl Creek Unit plus Twenty-one Thousand Seven Hundred Forty ($21,740) Dollars. In addition, the District shall pay an amount equal to the amount of any supplemental estimates of operation and maintenance cost for each irrigation season as set forth in any supplemental notice which, from time to time, may be given to the District by the Secretary on account of the deficiency in prior estimates for such irrigation seasons. The District payment for amount required to meet the District's proportionate share of the cost of operating and maintaining the Unit works which are in excess of the actual cost of such operating and maintaining the Unit works in any one year shall be credited on the District's next annual water service charge.

(b)  The District may elect to make payment of its annual water service charge so that the

Twenty - one Thousand Seven Hundred Forty (21,740) Dollars portion will be determined by application of a variable formula: *Provided,* That after the first payment is made in accordance with a variable formula, all succeeding payments shall be in accordance with a variable formula. The District's election to make payment in accordance with a variable formula shall be authorized by a vote of the District's electors. Notice of such election shall be given the Secretary by the District's Board of Commissioners on February 15 of the year before the year in which such type of payment is to begin. On March 15 following receipt of such notice and on March 15 of every year thereafter, the Secretary shall announce the amount of the water service charge which shall be due in the following year. The amount of each such charge shall be the sum of the District's proportionate share of the estimated cost of operating and maintaining the Owl Creek Unit and an amount determined by multiplying the product of the base charge and the price index factor by the agriculture parity ratio:

(1) The 'base charge' shall be Twenty-one Thousand Seven Hundred Forty ($21,740) Dollars.

(2) The 'price index factor' is that number which represents the relationship between the current prices received for farm products and the average prices received for farm products during the period 1939-44 as determined by the Secretary.

(3) The 'agricultural parity ratio' is the national agricultural parity ratio as conclusively determined by the Secretary for the year preceding the notice year.

(4) In making the determinations required in (2) and (3) above, the Secretary shall use the commodity prices indexes and the national agricultural parity ratio as determined by the Secretary of Agriculture under the provisions of Title II of the Agricultural Act of 1948 (Pub. Law 897,

80th Cong., 2d Sess.), as it may be amended from time to time. If the commodity price indexes and national parity ratio, which are basic to the determination of the annual installment under this Article, are not available for any year the annual installments due under this contract shall be Twenty - one Thousand Seven Hundred Forty ($21,740) Dollars plus the District's proportionate share of the estimated cost of operating and maintaining the Unit works for that year.

(5) The annual charge shall not be more than two hundred (200) percent nor less than twenty-five (25) percent of the base, plus the District's proportionate share of the estimated cost of operating and maintaining the Unit works.

## "ASSESSMENT OF LANDS

"10. (a) As provided in Section 71-1002, Wyo. Comp. Stats. 1945, the annual assessments against the individual tracts of land *for other than operation and maintenance and current expense,* shall be in accordance with the list attached to and made a part of this contract as Exhibit 'A'. The assessment against each acre of land now irrigated within the District, as shown in Exhibit 'A', is based upon (1) the relative priority of the water right appurtenant to such acre; (2) the productive capacity of such acre determined in accordance with the classification of its land; and (3) the relative elevation and accessibility of such acre.

(b) In the event that the distribution of the water supply may be altered in order to provide for the irrigation of new lands or for any other reason, the District shall promptly petition for a reassessment pursuant to the Wyoming Statutes. Such reassessment shall be submitted to the Secretary; and upon approval by the Secretary and confirmation pursuant to the Wyoming Statutes, it shall become a new Exhibit 'A' to this contract replacing the prior Exhibit 'A'.

## "DELIVERY OF WATER

"11. The District shall not deliver water in any year

for the irrigation of lands in excess of the total acreage shown on the schedule approved by the Secretary as provided in Article 8 (c).

## "AGREED CHARGES A GENERAL OBLIGATION OF THE DISTRICT

"12. The District as a whole is obligated to pay to the United States the charges becoming due as provided in this contract, notwithstanding the individual default in the payment to the District by individual water users of assessments, tolls, or other charges levied by the District.

## "LEVY OF ASSESSMENT, TOLLS AND CHARGES

"13. The District will cause to be levied and collected all necessary assessments, tolls and other charges, and will use all of the authority and resources of the District to meet the obligations of the District to make in full all payments to be made pursuant to this contract on or before the date such payments become due and to meet its other obligations under this contract.

## "PENALTY FOR DELINQUENT PAYMENTS

"14. Every charge required to be paid to the United States under this contract and which shall remain unpaid after it shall have become due and payable shall be subject to a penalty of one-half of one percent per month from the date of delinquency. The District shall impose on delinquencies in the payments of assessments, tolls or other charges levied by the District to meet its obligations under this contract such penalties as it is authorized to impose under the laws of the State of Wyoming.

## "DEFAULTS

"15. All benefits to accrue to the District or to persons or lands therein pursuant to this contract are conditioned upon payment to the United States of the charges provided in this contract, under the terms and conditions therein set out.

(a) Should the District fail to levy the assessments, tolls or other charges against any tract of land in the District required to be levied to meet the District's obligations to the United States under this contract, or having levied, should the District be prevented from collecting such assessments, tolls, or other charges by any judicial proceeding, or otherwise fail to collect them, such tract of land shall not be entitled to receive water under this contract.

(b) No water shall be furnished by the District to any persons or lands therein which may be in arrears in the payment to the District of any assessments, tolls, or other charges levied or established by the District for the purpose of raising revenues to meet the payment by the District to the United States of any of the District's obligations under this contract.

(c) The United States may, at its opinion, terminate all rights of the District to receive water pursuant to this contract on sixty (60) days' written notice to the District upon the failure of the District for two (2) or more successive or cumulative years to make any of the payments required in this contract to be made by the District to the United States at the times and in the manner provided. Upon the effective date of such termination, all obligations of the United States and all rights of the District, of any nature whatsoever arising under this contract, shall cease, but such termination shall not relieve the District of the obligation to make to the United States all payments becoming due pursuant to this contract prior to the effective date of such termination. No waiver at any time by the United States of its rights with respect to default or any other matter arising in connection with this contract shall be deemed to be a waiver with respect to any subsequent default or matter. All rights of action for breach of this contract are reserved to the United States as provided in Section 3737 of the Revised Statutes of the United States, as amended (41 U.S.C. 15).

## "APPLICATIONS OF PAYMENTS

"16. The United States may, at its option exercised by the Secretary apply any payment or part thereof by the District to the United States to any charges then due and payable by the District to the United States under the provisions of this contract.

## "DISTRICT TO INCLUDE ALL PROJECT LANDS

"17. The District shall cause all lands below Anchor reservoir which can be served by the Owl Creek Unit to be included within its boundaries, provided that the lands controlled by the Shoshone and Arapahoe Indian Tribes shall be excepted.

## "CONFIRMATION OF CONTRACT

"18. The execution of this contract shall be authoriszed by a vote of the electors of the District. If the electorate of the District vote their approval of this contract, the Board of Commissioners shall secure the confirmation of this contract. The confirmation proceedings shall be in compliance with Section 71-1002, Wyo. Comp. Stats. 1945. The District shall furnish the United States certified copies of the proceedings relating to the election on and confirmation of this contract.

## "DISTRICT TO SECURE AGREEMENT BY INDIVIDUAL WATER USERS

"19. The District shall secure the execution of an agreement for the exchange of water appurtenant to lands under the Lucerne and Dempsey ditches for water raised by the Lucerne pump. The form, execution, and filing of such agreement shall be in accordance with Sections 71-268 to 71-270, inclusive, Wyo. Comp. Stats. 1945, as amended, and shall be subject to approval of the Secretary.

## "TRANSFER OF TITLE TO CERTAIN DISTRICT WORKS

"20. (a) The District shall convey to the United States, free of all lien and encumbrance except the lien of that certain mortgage and other indicia of

obligation, as described below in paragraph 21, all right, title, and interest to (a) the site of the present Lucerne pumping plant constructed by the District; (b) the discharge pipe-line and right-of way therefor leading from such pumping plant to the Lucerne ditch; (c) the Lucerne ditch and right-of-way therefor leading from the discharge end of the pipe-line to the point where it enters a natural drainage to the Big Horn River; and (d) the wasteway and right-of-way therefor leading from such pumping plant to the Big Horn River; all as shown on the plat hereto attached as Exhibit 'B' and by this reference made a part hereof. The District shall have the right to remove from the site of the present Lucerne pumping plant constructed by the District and to salvage the pumping facilities heretofore constructed thereon by the District.

(b)   The District shall further convey and quitclaim to the United States all its right, title, and interest in the diversion dam in the Big Horn River which is presently used for diverting water to the present pumping plant constructed by the District. The District shall also convey and quitclaim to the United States all its right, title, and interest in the Lucerne pumping ditch subject to the District's right and easement to use, operate, and maintain said ditch for the conveyance of water to District lands for so long as this contract shall remain in effect.

(c)   The District shall make and record without cost to the United States the conveyances above described in (a) and (b) within sixty (60) days after the execution of this contract by the United States. The District shall procure and have recorded without cost to the United States all assurances of title and affidavits which the District may be advised by the United States are necessary and proper to show in the District complete fee simple unencumbered title to said property described above in (a).

"PAYMENT OF INDEBTEDNESS

"21.   On or before January 1 of the fifth year fol-

lowing the giving of the notice described above in paragraph 8 (a), the District shall acquire and cause the cancellation of present bonds and other indicia of obligation now outstanding against the District. To this end, during each of the first five years following the giving of the notice described above in paragraph 8 (a) the District shall levy and collect an assessment on its irrigable lands for the purpose of securing the funds necessary for the acquiring and cancellation of such present bonds and other indicia of obligation.

## "LANDS NOT TO RECEIVE WATER UNTIL OWNERS THEREOF EXECUTE CERTAIN CONTRACTS

"22. No water shall be furnished under this contract to any excess lands as defined in Article 24 of this contract unless the owners thereof shall have executed valid recordable contracts in form satisfactory to the Secretary agreeing to the sale of such lands under terms and conditions satisfactory to the Secretary and at prices not to exceed those fixed by the Secretary. No sale of any such lands shall carry the right to receive water made available hereunder unless and until the purchase price involved in such sale is approved by the Secretary; and upon proof of fraudulent representation as to the true consideration involved in such sales, the Secretary may instruct the District by written notice to refuse to deliver any water subject to this contract to the land involved in such fraudulent sales, and the District thereafter shall not deliver said water to such lands.

## "VALUATION AND SALE OF LANDS

"23. (a) The value of the excess irrigable lands, as hereinafter defined, within the District for the purpose of this and Articles 22 and 24 of this contract shall be determined, subject to the approval thereof by the Secretary, by appraisers, one of whom shall be designated by the Secretary, one of whom shall be designated by the District, and one of whom shall be designated by the two appraisers so designated by the Secretary and the District.

(b) The following principles shall govern the appraisal:

(1)   No value shall be given such lands on account of the existing or prospective possibility of securing water from the Project.

(2)   The value of improvements on the land at the time of said appraisal shall be included therein, but shall also be set forth separately in such appraisal.

(c)   The cost of the first two appraisals and each subsequent appraisal requested by the United States shall be paid by the United States and become a part of the cost of constructing the Owl Creek Unit. The cost of subsequent appraisals requested by landowners shall be paid by the landowner in advance of the making of such appraisal.

(d)   Any improvements made or placed on the appraised land after the appraisal hereinabove provided for may be appraised in like manner.

## "EXCESS LANDS

"24.   (a)   As used herein, the term "excess land' means that part of the irrigable land within the District in excess of 160 acres held in the beneficial ownership of any single person; or in excess of 320 acres held in the beneficial ownership of husband and wife as joint tenants or as tenants in common. The term 'large landowner' means an owner of excess lands, and the term 'nonexcess land' means all irrigable land under the Project which is not excess land as defined herein.

(b)   Each large landowner as a further condition precedent to the right to receive water for any of his excess lands shall:

(1)   Before the initial delivery date or before the expiration of six months from the announcement thereof, whichever occurs first, execute a valid recordable contract in form satisfactory to the Secretary, agreeing to the provisions herein contained and agreeing to dispose of his excess lands in accordance therewith to persons who can take title thereto as nonexcess land as herein provided and at a price not to exceed the approved,

appraised value of such excess land and within a period of ten years after the date of the execution of said recordable contract and agreeing further that if said land is not so disposed of within said period of ten years the Secretary shall have the power to dispose of said land subject to the same conditions on behalf of such large landowner subject to conditions all as herein provided; and the District agrees that it will refuse to deliver water to any large landowner other than for his nonexcess lands until such owner meets the conditions precedent herein stated.

(2) Within thirty days after the date of notice from the United States requesting such large landowner to designate his irrigable lands under the project which he desires to designate as nonexcess lands, file in the office of the District, in duplicate, one copy thereof to be furnished by the District to the Bureau of Reclamation, his written designation and description of lands so selected to be nonexcess lands, and upon failure to do so the District shall make such designation and mail a notice thereof to such large landowner, and in the event the District fails to act within such period of time as the contracting officer considers reasonable, such designation will be made by the contracting officer who will mail a notice thereof to the District and the large landowner. The large landowner shall become bound by any such action on the part of the District or the contracting officer, and the District will deliver water only to the land so designated to be nonexcess land.

## "RULES AND REGULATIONS

"25. The Secretary reserves the right, so far as the purport thereof may be consistent with the provisions of this contract, to make rules and regulations and directives and to add to and modify them as may be deemed proper and necessary to carry out the true intent and meaning of the law and of this contract. Such rules and regulations may provide for operating procedures and practices, accounting procedures and practices, and the maintenance of reserve funds and de-

preciation funds, and the District agrees to observe such rules, regulations and directives.

### "CHANGES IN DISTRICT ORGANIZATION— ASSIGNMENT LIMITED—SUCCESSORS AND ASSIGNS OBLIGATED

"26. (a) While this contract is in effect and after the requirements of Article 17 have been met, no change shall be made in the District, by inclusion or exclusion of lands, by proceedings to dissolve or otherwise, except upon the Secretary's written consent thereto.

(b) The provisions of this contract shall apply to and bind the successor and assigns of the parties hereto, but no assignment or transfer of this contract, or any part thereof or interest therein, shall be valid until approved by the Secretary.

### "NOTICES

"27. Any notice authorized or required by the contract shall be deemed properly given, except where otherwise herein specifically provided, if mailed postage prepaid, to the Regional Director, Region 6, Bureau of Reclamation, Billings, Montana, on behalf of the United States, and to the Secretary of the Owl Creek Irrigation District, Thermopolis, Wyoming, on behalf of the District. The designation of the person to be notified or the address of such person may be changed at any time by similar notice.

### "DISCRIMINATION AGAINST EMPLOYEES OR APPLICANTS FOR EMPLOYMENT PROHIBITED

"28. The District shall not discriminate against any employee or applicant for employment because of race, creed, color, or national origin, and shall require an identical provision to be included in contracts relating to the performance of this contract. This provision, however, does not refer to, extend to, or cover the activities of the District which are not related to or involved in the performance of this contract.

## "CONTINGENT ON APPROPRIATIONS OR ALLOTMENTS OF FUNDS

"29. The expenditure of any money or the performance of any work by the United States herein provided for which may require appropriations of money by Congress or the allotment of funds shall be contingent on such appropriations or allotments being made. The failure of Congress to appropriate funds or the failure of any allotment of funds shall not, however, relieve the District from any obligations theretofore accrued under this contract nor give the District the right to terminate this contract as to any of its executory features. No liability shall accrue against the United States in case such funds are not appropriated or allotted.

## "OFFICIALS NOT TO BENEFIT

"30. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise herefrom, but this restriction shall not be construed to extend to this contract if made with a corporation or company for its general benefit.

IN WITNESS WHEREOF, the parties hereto have signed their names the day and year first above written.

UNITED STATES OF AMERICA

By ................................................................
Title: Secretary of the Interior

OWL CREEK IRRIGATION DISTRICT

By: L. F. Thornton
Title: Chairman of the Board"

ATTEST:

FRED E. OSTBERG (Seal)
    Secretary

The extensive final decree or order entered by the court, the review of which is sought, also contains among other things the following provisions:

"Providing that the present District indebtedness in the amount of $19,000.00 with interest from July 1, 1950, shall be paid by the irrigable land within said enlarged District during the first five years following the furnishing of water therefor and requiring the payment by said District to the Bureau of Reclamation of the sum of $21,740 plus annual operation and maintenance costs for a period of 35 years, to begin five years after the water is made available by the Bureau of Reclamation for delivery to the lands in said District, operation and maintenance only to be paid during the first 5-year period, and attaching a schedule of assessments for benefits and for construction totaling $1,-410,750.00, * * * "

This part of the order under review apparently confirms and attempts to carry into effect paragraph 21 of the contract as above quoted. It operates to impose upon the objecting private landowners indebtedness of $19,000.00 which they had no part in incurring and to the payment of which they now decline to be held.

Petitioners' pleading aforesaid stated that the following question and proposition was submitted for approval or rejection to the landowners of lands which could be served by the reclamation works constructed by the Government to-wit:

" 'Shall the Owl Creek Irrigation District, acting by and through at the discretion of its Board of Commissioners, enter into a contract with the United States of America, such contract to be substantially in accordance with the form of contract identified as Region 6 draft, 12/22/47, Rev. 8/3/49, Rev. 8/26/49, Rev. 9/8/49, Rev. 11/10/49, Rev. 12/16/49, Rev. 1/17/50, which will provide, among other things, for the District's payment to the United States of America of its proportionate share of the cost of operating and maintaining the Owl Creek Unit of the Missouri River Basin Project, plus an annual payment of $21,740 payable, at the option of the District, in accordance with the variable formula, such annual payment of the $21,740 (or its variable alternative) to be assured by the District's

annual assessment against the lands of the District in accordance with annual rates similar to or computed on the same rate basis as the annual assessments shown on Exhibit 'A' of said contract.' "

The petitioners' pleading then incorporates its paragraph numbered "XI" which states verbatim:

"That following the election said Board of Commissioners canvassed the vote and determined that 98% of the acreage within said District which could be served by said Owl Creek Unit, exclusive of the lands controlled by the Shoshone and Arapahoe Indian tribes, had been represented at such election and that a majority of the persons and acreage voting were in favor of the approval and execution of said contract; and that one hundred and ten (110) ballots were cast in person and by proxy and a total of 15,069 acres were represented thereby. That a total of 68 ballots, representing 9,407 acres of irrigable land, were marked 'For the Contract,' of which number 51 ballots, representing 8,313 acres, were cast by landowners or entrymen, within the District, who were present and voting; 11 ballots, representing 833 acres, were cast by proxy on behalf of landowners or entrymen with land within the District; and 6 ballots, representing 261 acres, were cast by owners or entrymen of land outside the District which could be served by said Owl Creek Unit; that a total of 42 ballots, representing 5,661 acres of irrigable land, were marked 'Against the Contract,' of which number 21 ballots, representing 2,848 acres were cast by landowners or entrymen within the District who were present and voting; 5 ballots, representing 455 acres, were cast by proxy on behalf of landowners or entrymen with land within the District; and 16 ballots, representing 2,358 acres, were cast by owners or entrymen of land outside the District which could be served by said Owl Creek Unit. That pursuant to said election said Board of Commissioners, by resolution dated March 1, 1950, authorized the execution of said contract and directed the institution of these proceedings for the purpose of securing this Court's examination, approval, and confirmation of said contract and the proceedings leading up to the execution of same and the assessment for benefits and construction

as required therein and for the purpose of securing the inclusion within the District of irrigable lands which may be served by said Owl Creek Unit, except the lands controlled by the Shoshone and Arapahoe Indian tribes."

In this connection it may be noted that the question submitted to the landowners and quoted above is not altogether clear. While the language "Region 6 draft, 12/22/47, Rev. 8/3/49, Rev. 8/26/49, Rev. 9/8/49, Rev. 11/10/49, Rev. 12/16/49, Rev. 1/17/50," and also "plus an annual payment of $21,740 payable, at the option of the District, in accordance with a variable formula, such annual payment of the $21,740 (or its variable alternative) is, to say the least, obscure in its meaning, it may be perhaps deduced that "Region 6 draft 12/22/47," etc. might be considered to indicate the number of times the contract was revised before being submitted; the remainder of the language quoted is decidedly problematical as to what it really meant. It is extremely doubtful whether the ranch landowners who voted on this submitted question understood what the proposition was on which they were voting. While the so-called Indian lands of the Shoshone and Arapahoe tribes consisting approximately of 2300 acres of irrigable land appear to be topographically within the area of the newly proposed district, the petitioners nevertheless requested that these Indian lands be excluded from that area. This request the order of the district court undertook to carry out—for after describing the lands included, the order states "that the boundaries (of the district) should be amended so as to exclude said lands (the tribal lands) from said district."

At this point it is imperative that it be noted what the purpose and authority given by our State law to the District Board are, in making contracts with the United States of America. In Section 71-813 W.C.S.

1945 dealing with the organization of the Commissioners of such districts, their powers and duties the statute directs them to elect one of their number as president and appoint a secretary treasurer who may or may not be a member of the board. These officers are then directed to transact the business of the district with certain powers so to do. When the matter of executing contracts with the United States of America was considered by the lawmakers the latter were quite explicit for they said:

"For the *purpose of acquiring control over government land within the district and complying with the provisions of the act of congress of August 11, 1916 (U.S. C., Tit. 43, §§ 621-630; 9A F.C.A., Tit. 43, §§ 621-630)*, the board shall have authority to make such investigation, and based thereon, such representation and assurance to the secretary of the interior as may be requisite; and the board may contract with the United States for the construction, operation and maintenance of the necessary works for the delivery and distribution of water therefrom under the provisions of the federal reclamation act (U.S.C., Tit. 43, § 371 et seq; 9A F.C.A., § 371 et seq.), and all acts amendatory thereof and supplementary thereto and the rules and regulations established thereunder, or for the assumption, as principal or guarantor of the indebtedness to the United States on account of district lands." (Italics supplied.)

Just here it should be kept in mind what will later herein be more fully considered, that Bureau expert testimony tells us that there is no government land in the district upon which this section may operate.

To make it additionally quite clear what was intended this statute, it will be noted, proceeded to cite certain sections of Federal Law, viz.: "The act of congress of August 11, 1916, (U.S.C., Tit. 43, §§ 621-630; 9A F.C.A., Tit. 43, §§ 621-630)", and then said—"the board shall have authority to make such investigation,

and based thereon, such representation and assurance to the secretary of the interior as may be requisite; and the board may contract with the United States for the construction, operation and maintenance of the necessary works for the delivery and distribution of water therefrom under the provisions of the federal reclamation act (U.S.C., Tit. 43, §371 et seq; 9A F.C.A., § 371 et seq.), and all acts amendatory thereof and supplementary thereto and the rules and regulations established thereunder, or for the assumption, as principal or guarantor of the indebtedness to the United States on account of district lands." An inspection of the sections last above cited indicates that "public lands" *only* were being considered. This would seem to explain a number of provisions in the contract quoted above and which are difficult to understand if "privately owned lands" only were sought to be dealt with by the Board and the United States through its Secretary of the Interior in the contract set forth above and it becomes increasingly clear when that is always kept in mind. Section 621 U.S.C.A. provides:

"When in any State of the United States under the irrigation laws of said State there has, prior to August 11, 1916, been organized and created or shall thereafter be organized and created any irrigation district for the purpose of irrigating the lands situated within said irrigation district, and in which irrigation district so created or to be created *there shall be included any of the public lands of the United, States, such public lands so situated in said irrigation district, when subject to entry, and entered lands within said irrigation district, for which no final certificates have been issued,* which may be designated by the Secretary of the Interior in the approval by him of the map and plat of an irrigation district as provided in section 623 of this chapter, are hereby made and declared to be subject to all the provisions of the laws of the State in which such lands shall be situated relating to the organization, government, and regulation of irrigation districts for the reclamation and irrigation of arid

lands for agricultural purposes, to the same extent and in the same manner in which the lands of a like character held under private ownership are or may be subject to said laws: *Provided,* That the United States and all persons legally holding unpatented lands under entry made under the public land laws of the United States are accorded all the rights, privileges, benefits and exemptions given by said State laws to persons holding lands of a like character under private ownership, except as hereinafter otherwise provided: *Provided further,* That this chapter shall not apply to any irrigation district comprising a majority acreage of unentered land. (Aug. 11, 1916, c. 319, § 1, 39 Stat. 506.)" (Italics supplied).

What is said in the paragraph last above quoted is supplemented and supported by what appears in the Federal Reclamation Act provisions in Title 43 U.S. C.A. § 371 et seq and its amendatory acts thereafter cited in section 71-813 W.C.S. 1945 set out above.

By adopting these views it is made unnecessary to consider whether § 71-813 supra when construed with subdivisions 22, 23 and 24 of the contract between the Secretary of the Interior and the District fall within constitutional prohibitions. For it is, of course, the rule that "Courts will not pass on the constitutionality of a statute unless the necessity therefor in pending case clearly appears," Tavegia vs. Bromley, 67 Wyo. 93, 106; 214 Pac. (2d) 975. "Courts will not declare law invalid, if it can be upheld on any reasonable ground." Arnold vs. Bond, 47 Wyo. 236, 34 Pac. (2d) 28; Taxpayers' League of Carbon County, Wyo. vs. McPherson 49 Wyo. 251, 54 Pac. (2d) 897; Stewart et al vs. City of Cheyenne 60 Wyo. 497, 154 Pac. (2d) 355.

Let us now review briefly those sections of the contract aforesaid which have been definitely mentioned, viz: 22, 23 and 24. The source of many of these pro-

62

visions in this contract becomes quite evident when we examine the terminology of the Act of May 25, 1926, Chapter 383, § 46, 44 Stat. 649 of the Amended Reclamation Act set out in Pocket Parts of 1952 of Title 43 of U.S.C.A. pages 97, 98 where section 423e reads practically verbatim as follows:

"No water shall be delivered upon the completion of any new project or new division of a project initiated after May 25, 1926, until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law providing for payment by the district or districts of the cost of constructing, operating, and maintaining the works during the time they are in control of the United States, such costs of constructing to be repaid within such terms of years as the Secretary may find to be necessary, in any event not more than forty years from the date of public notice hereinafter referred to, and the execution of said contract or contracts shall have been confirmed by a decree of a court of competent jurisdiction. Prior to or in connection with the settlement and development of each of these projects, the Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authorities of the State or States wherein said projects or divisions are located whereby such State or States shall cooperate with the United States in promoting the settlement of the projects or divisions after completion and in the securing and selecting of settlers. Such contract or contracts with irrigation districts hereinbefore referred to shall further provide that all irrigable land held in private ownership by any one owner in excess of one hundred and sixty irrigable acres shall be appraised in a manner to be prescribed by the Secretary of the Interior and the sale prices thereof fixed by the Secretary on the basis of its actual bona fide value at the date of appraisal without reference to the proposed construction of the irrigation works; and that no such excess lands so held shall receive water from any project or division if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands under terms and conditions satisfactory to the

Secretary of the Interior and at prices not to exceed those fixed by the Secretary of the Interior; and that until one-half the construction charges against said lands shall have been fully paid no sale of any such lands shall carry the right to receive water unless and until the purchase price involved in such sale is approved by the Secretary of the Interior and that upon proof of fraudulent representation as to the true consideration involved in such sales the Secretary of the Interior is authorized to cancel the water right attaching to the land involved in such fraudulent sales: *Provided further,* That the operation and maintenance charges on account of lands in said projects and divisions shall be paid annually in advance not later than March 1. * * * "

Subdivision 22 of the contract aforesaid uses this language as we have seen:

## "LANDS NOT TO RECEIVE WATER UNTIL OWNERS THEREOF EXECUTE CERTAIN CONTRACTS

"22.   No water shall be furnished under this contract to any excess lands as defined in Article 24 of this contract unless the owners thereof shall have executed valid recordable contracts in form satisfactory to the Secretary agreeing to the sale of such lands under terms and conditions satisfactory to the Secretary and at prices not to exceed those fixed by the Secretary. No sale of any such lands shall carry the right to receive water made available hereunder unless and until the purchase price involved in such sale is approved by the Secretary; and upon proof of fraudulent representation as to the true consideration involved in such sales, the Secretary may instruct the District by written notice to refuse to deliver any water subject to this contract to the land involved in such fraudulent sales, and the District thereafter shall not deliver said water to such lands."

If this language should be regarded as applicable to privately owned lands the owner thereof if he undertakes to buy lands in excess of 160 acres, or 320 acres in the event he is married, can get no water from the

proposed storage reservoir through the district unless he executes and delivers a recordable contract satisfactory to the Secretary of the Interior, an official located in the nation's capital on the Atlantic seaboard, and who by experience, training, or education and as a matter of fact knows very little about the needs of the ranch owners and water users in west central Wyoming on Owl Creek. The terms and conditions of such contracts also must meet the approval and requirements of that official whether they are fair or unfair to the landowner—the landowner himself having nothing whatever to propose about those terms. If the price fixed by the Secretary of the Interior is low the landowner will still be forced to sell his land at a loss whether he wishes to do so or not. The excess lands thus held will even then be prevented from securing the necessary water for their use unless the Secretary sees fit to allow them to have it. Upon the true consideration of the sale not being shown the Secretary may treat it as fraudulent and decline to allow water to be given to such lands. In other words the landowner is entirely at the mercy of that official. It is, of course, true that if the private landowner *consents* to provisions of this character or *does not object to them* a different situation is presented.

In Lincoln Land Co. vs. Goshen Irrigation District 42 Wyo. 229, 293 Pac. 373, it was pointed out that should a landowner consent to dispose of excess holdings he could not after the construction of the irrigation works making water available for irrigation, escape assessment on the ground that the excess lands were not benefited. Naturally, the same thing would be true if the lands involved were public lands of the United States and subject to its jurisdiction and owned by it. The officials charged with the duty of adminis-

tering those lands can act as they see fit subject to the directives of Congress.

Subdivision 23 declares that:

## "VALUATION AND SALE OF LANDS

"23. (a) The value of the excess irrigable lands, as hereinafter defined, within the District for the purposes of this and Articles 22 and 24 of this contract shall be determined, subject to the approval thereof by the Secretary, by appraisers, one of whom shall be designated by the Secretary, one of whom shall be designated by the District, and one of whom shall be designated by the two appraisers so designated by the Secretary and the District.

(b) The following principles shall govern the appraisal:

(1) No value shall be given such lands on account of the existing or prospective possibility of securing water from the Project.

(2) The value of improvements on the land at the time of said appraisal shall be included therein, but shall also be set forth separately in such appraisal.

(c) The cost of the first two appraisals and each subsequent appraisal requested by the United States shall be paid by the United States and become a part of the cost of constructing the Owl Creek Unit. The cost of subsequent appraisals requested by landowners shall be paid by the landowner in advance of the making of such appraisal.

(d) Any improvements made or placed on the appraised land after the appraisal hereinabove provided for may be appraised in like manner."

It is plain that the excess or original private landowner would be helpless under the imposition of such terms of sale. He would have no voice at all in fixing a price at which his excess lands should be sold. In es-

tablishing prices on the lands it would not be possible for him to take into consideration factors which in ordinary cases he would always reckon with. No matter how severe his loss might be in consequence of such an arrangement, he would be obliged to submit. This is hardly the character of a contract private landowners are customarily in the habit of making when they deal with one another. Their contracts usually involve the elements of fairness and reasonableness.

In re Greybull Valley Irrigation District 52 Wyo. 479, 502, 76 Pac. (2d) 339, 347, this court said in referring to the powers of the Commissioners of an irrigation district that they have "the right to meet all conditions made by the United States government, *at least if not unreasonable,* and if not in conflict with the laws of the state." The provisions of subdivisions 22 and 23 supra do not appear to us as reasonable.

Subdivision 24 of the contract which the district court has approved and confirmed declares that:

## "EXCESS LANDS

"24. (a) As used herein, the term 'excess land' means that part of the irrigable land within the District in excess of 160 acres held in the beneficial ownership of any single person; or in excess of 320 acres held in the beneficial ownership of husband and wife as joint tenants or as tenants in common. The term 'large landowner' means an owner of excess lands, and the term 'nonexcess land' means all irrigable land under the Project which is not excess land as defined herein.

(b) Each large landowner as a further condition precedent to the right to receive water for any of his excess lands shall:

(1) Before the initial delivery date or before the expiration of six months from the announcement thereof, whichever occurs first, execute a

valid recordable contract in form satisfactory to the Secretary, agreeing to the provisions herein contained and agreeing to dispose of his excess land in accordance therewith to persons who can take title thereto as nonexcess land as herein provided and at a price not to exceed the approved, appraised value of such excess land and within a period of ten years after the date of the execution of said recordable contract and agreeing further that if said land is not so disposed of within said period of ten years the Secretary shall have the power to dispose of said land subject to the same conditions on behalf of such large landowner subject to conditions all as herein provided; and the District agrees that it will refuse to deliver water to any large landowner other than for his nonexcess lands until such owner meets the conditions precedent herein stated.

(2) Within thirty days after the date of notice from the United States requesting such large landowner to designate his irrigable lands under the project which he desires to designate as nonexcess lands, file in the office of the District, in duplicate, one copy thereof to be furnished by the District, to the Bureau of Reclamation, his written designation and description of lands so selected to be nonexcess lands, and upon failure to do so the District shall make such designation and mail a notice thereof to such large landowner, and in the event the District fails to act within such period of time *as the contracting officer considers reasonable,* such designation will be made by the contracting officer who will mail a notice thereof to the District and the large landowner. The large landowner shall become bound by any such action on the part of the District or the contracting officer, and the District will deliver water only to the land so designated to be nonexcess land." (Italics supplied).

The large landowner is specifically defined in this subdivision and additional burdens imposed upon him. He is forbidden to receive water for excess lands until

he acquiesces in all the conditions which by this and the two preceding paragraphs are laid upon him. When and how under the weight of such conditions can the American farmer progress? He ordinarily and habitually endeavors to secure more land for tillage than the 160 acres he began with. It is to be noted that under these subdivisions he cannot do this. In this arid and semi-arid western country unless he can hold and control a comparatively large amount of land his life's work will result in a complete failure. In the rich arable lands of the East it is not so vital that the limits of land holdings be enlarged; but even there if an owner practices frugality and careful management a comparatively small plot of ground leads to success and wealth—the goal of every American citizen who in the beginning in this courtry won the west for the nation. These contract clauses which are thus questioned if applied to owners of private land are unreasonable, coercive and devised to deprive them of their property against their will and without invoking the condemnatory processes which require due compensation to be made when land is thus taken. These processes embody the full protective machinery of the law as concerns the private property owner. These clauses now drawn in question (subdivisions 22, 23 and 24) are subversive of the most elementary rights which our forefathers carried from English law to this country and which were centuries in their formation. Though it appears from the record that the contract aforesaid was revised no less than seven times these objectionable clauses were not allowed to be eliminated therefrom.

It is quite obvious if these contract clauses were to be scrutinized under the light of familiar constitutional limitations they would necessarily fall. However, as has already appeared they do not have to be so examined for there is testimony in the record supplied by the

official reports of the employees of the Bureau of Reclamation that *the major portion or 86.5% of the land within the area of the irrigation district is privately owned while the remaining 13.5% of the land comprising about 2300 acres of said district is tribal Indian lands* which have, as already indicated, been definitely excluded, by the court order here under review, from the irrigation district area. In other words the privately owned lands which should be excluded from the district are those which are held by non-consenting parties thereto, i.e. by the parties who object to having their lands included in the district area. Indeed most of them, the record shows, were excluded therefrom by agreement of the parties and their counsel in the previously recreated district.

It is difficult to perceive that lands held in private ownership for more than a quarter of a century—as many of the lands owned by the objectors have been—can be forced into a district which is required to operate under a contract devised to compel the owner to dispose of some of his property whether he wishes to do so or not and at valuations which may meet his emphatic disapproval, and concerning which he has been permitted to have nothing to say. Including lands —unless owned by the United States or whose owners have consented to be so bound—in district boundaries under such obligations we hardly think "just"—the ultimate test of whether lands should be included or excluded in an irrigation district. (Sec. 71-816 W.C.S. 1945). It is not surprising to find an objecting landowner testifying that he tried to sell his land, had it practically sold and: "they looked into the records and found out this contract had been written up. I don't know where it was from—they dropped me like a hot potato."

Finally it is to be observed that there is no provision

in the contract here involved for transferring the title to the proposed irrigation works—the dam and pumping plant—from the United States of America to the Irrigation District even after the latter has paid to the Secretary of the Interior $1,410,750.00, (the amount to be paid to the Secretary of the Interior by the District) ; the remainder of the cost of the project which totals between three and four million dollars is to be charged off by the Reclamation Bureau to the tax payers of the United States. We do not find any authority vested in the Commissioners of the District by law to pay the amount due for these proposed irrigation works without at least obtaining for the district the property for which they make such payments out of the District's assessments over a period of many years.

It results from what has been said that the order of the district court of Hot Springs County under review should be reversed and remanded with instructions that the privately owned lands of all the objectors should be excluded from the area of the proposed irrigation district, and the contract aforesaid should be rectified and altered in accord with the views herein expressed.

Reversed with instructions.

BLUME, C. J., and ILSLEY, J., concur.

## ON PETITION FOR REHEARING

(No. 2557; June 16th, 1953; 258 Pac. (2d) 220)

## OPINION

RINER, Justice:

The respondents in this case have filed an extended petition for re-hearing thereof. They undertake to criticize every conclusion reached by this court though the opinion rendered and filed was delivered only after a thorough and careful study of the record, the decree of the district court and the revised contract between the United States of America through the Secretary of the Interior and the Owl Creek Irrigation District which contract the decree aforesaid approved and confirmed.

The members of the court, as then constituted, unanimously agreed that the result reached in this case in this court was not only reasonable, but fair and just, and prevented the landowners in the Owl Creek District from being drawn into and bound by an agreement which we were unable to view in any other light than that it was inequitable, unfair and in serious disregard of the rights of the landowners who were ranch folk and were not learned in the law and who confidently believed that they would be protected in a matter of such importance by the courts of this State.

It was pointed out in the opinion filed herein that the appellants were, by said contract and decree aforesaid, obligated to liquidate an indebtedness which they had no part in incurring and which was designed only to furnish supplemental water to a comparatively small part of the proposed district and at no time was it regarded as being in the least beneficial to that

part of the district lands which were located in what is generally referred to in the record as the "upper area" as distinguished from the "middle area" and the "Lucerne area." There was and is no claim made by respondents that the lands in the "upper area" were in any way benefited by the so-called Lucerne pumping unit as established and owned by the 2295 acres of lands in the "Lucerne or lower area." That acreage has never claimed that the $19,000 indebtedness which is the unpaid portion of the cost of this unit should be exacted proportionately from the "upper area" landowners. Respondents admit that "the lands receiving the water from the Lucerne pumping plant are the only lands now being benefited therefrom." It is apparent that the authorities cited and relied upon by the respondents in their petition for rehearing as it concerns this phase of the case are not in point. They invariably assume that the annexed territory will be benefited. That situation does not obtain here.

As stated in the original opinion and in respondents' brief: "1. The lands irrigated in The Owl Creek Valley fall in three areas: (a) The Lucerne or lower area embraced in Commissioner District Number one; (b) the Middle area embraced in Commissioner District Number two; and (c) the South Fork and Middle Fork areas, or Upper area, often referred to as South Fork area, comprising Commissioner District Number three." The Lucerne or "lower" and the "middle" areas of the district according to the record would derive the most benefit from the proposed irrigation works, the "upper" area of the proposed enlarged district would derive very little if any benefit. The "lower" or Lucerne area as proposed and approved by the district court contains approximately 8175.84 acres. The approved middle area has some-

thing over 16,158.02 acreage less approximately 2300 acres included in the ranch tribal lands of the Shoshoni and Arapahoe Indians which were excluded from the district though within its topographical boundaries as previously fixed by court order. The "upper" area as enlarged for assessment by the final order of the district court contains about 4500 acres. The total acreage of the three areas approved for assessment by the trial court amount to approximately 30,000 acres. The "lower" and "middle" areas can grow what are designated "row" crops such as peas and beans. The "upper area", due to its elevation and short growing season, is practically confined to growing forage crops and consequently relies on cattle raising mainly as an industry.

The new Owl Creek unit proposed to increase the Lucerne pumping unit to a larger capacity so as to embrace an additional acreage of 4421 instead of the 2295 acres for which the pumping unit was originally designed. It is accordingly urged that the lands in the "upper" area will be thereby benefited because the lands in the Lucerne and "middle" areas will use the additional water thus provided and the "upper" area lands will not need to release any of the water of Owl Creek so that it may flow down to meet the demands of the downstream water users.

Paragraph 19 of the proposed contract aforesaid was drafted evidently with this contention in mind for it states:

"19. The District shall secure the execution of an agreement for the exchange of water appurtenant to lands under the Lucerne and Dempsey ditches for water raised by the Lucerne pump. The form, execution, and filing of such agreement shall be in accordance with Sections 71-268 to 71-270 inclusive, Wyo. Comp. Stats. 1945, as

amended, and shall be subject to approval of the Secretary."

but sections 71-268 to 71-270 inclusive W.C.S. 1945 deal only with underground waters with which this litigation is not concerned.

However, Chapter 116 Laws of Wyoming 1947 Sections 1 to 4 inclusive (Sections 71-409 to 71-412 inclusive W.C.S. 1945) does provide for exchange of water between appropriators and it is possible that Article 19 intended to refer to that Session Law. Section 1 thereof reads (Chapter 116) :

"The owners of appropriative rights in and to the use of waters of any natural Wyoming stream, spring, lake or other collection of still water, where either (a) the course of the appropriation is at times insufficient to fully satisfy such appropriation, or (b) a fuller conservation and utilization of the State's water resources can be resultantly accomplished, may arrange *by agreement between themselves for the delivery and use of either storage or direct flow water from another source."*
(Italics supplied.)

It will be observed that this exchange must be made *"by agreement".* How that agreement will be obtained by the district under Article 19 supra is not altogether clear when the landowners of the "upper" area are for the most part satisfied with the water rights they now have and feel that they do not need more water as was testified to by several of the appellant objectors. In this connection it may be noted also that under the revised contract aforesaid in Section 7 thereof it is stated that *"construction of the Owl Creek Unit shall not, at the option of the United States be commenced until the district has completed the action set forth,"* in Article 19 and 20 quoted above and infra. That is to say that unless the district procures an exchange agreement between water users in

the Lucerne and middle areas and the appellants and objectors in this proceeding with reference to the water rights involved, the United States need not commence construction of the Owl Creek Unit project at all. It is also to be noted that these exchange agreements are to be *"subject to the approval of the Secretary" of the Interior.* The State Engineer of this State, the official charged by law, with the administration of the water laws of Wyoming is ignored.

It is contended that this court erred in considering "the so-called Indian" ranch lands of the Shoshoni and Arapahoe tribes to be public lands of the United States. We do not seem to find in the original opinion any such statement relative to our considering these lands to be anything other than what they are, viz: lands occupied by Indian claimants and wards of the Government — the title of which lands remains in the United States.

Complaint is made that the court pointed out that even after the district has paid the Secretary of the Interior nearly one and a half million dollars the landowners are not to have title to the proposed Anchor Dam and other irrigation works. Yet it is significant that the district nevertheless is obligated by the revised contract aforesaid to act in a decidedly different manner. Article 20 referred to above enjoins that:

"20. (a) The District shall convey to the United States, free of all lien and encumbrance except the lien of that certain mortgage and other indicia of obligation, as described below in paragraph 21, all right, title and interest to (a) the site of the present Lucerne pumping plant constructed by the District; (b) the discharge pipeline and right-of-way therefor leading from such pumping plant to the Lucerne ditch; (c) the Lucerne ditch and right-of-way therefor leading from the discharge end of the pipe-line to the

point where it enters a natural drainage to the Big Horn River; and (d) the wasteway and right-of-way therefor leading from such pumping plant to the Big Horn River; all as shown on the plat hereto attached as Exhibit 'B' and by this reference made a part hereof. The District shall have the right to remove from the site of the present Lucerne pumping plant constructed by the District and to salvage the pumping facilities heretofore constructed thereon by the District.

"b) The District shall further convey and quit-claim to the United States all its right, title and interest in the diversion dam in the Big Horn River which is presently used for diverting water to the present pumping plant constructed by the District. The District shall also convey and quit-claim to the United States all its right, title and interest in the Lucerne pumping ditch subject to the District's right and easement to use, operate, and maintain said ditch for the conveyance of water to District lands for so long as this contract shall remain in effect.

"(c) The District shall make and record without cost to the United States the conveyances above described in (a) and (b) within sixty (60) days after the execution of this contract by the United States. The District shall procure and have recorded without cost to the United States all assurances of title and affidavits which the District may be advised by the United States are necessary and proper to show in the District complete fee simple unencumbered title to said property described above in (a)".

and here it should again be recalled that by Article 7 quoted supra the United States is not required to take one step looking to the construction of the Owl Creek Unit until the district obeys the mandate of the contract laid upon it by said Article 20. In brief the United States is not required to transfer title to the district to any irrigation works it may construct and

receive pay for to the extent of one and a half million dollars but the district within sixty (60) days of the execution of this revised contract by the United States and before anything is done by the party last mentioned must convey to it all the irrigation works the district owns by deed at its own cost and expense. It is not easy to believe that the Wyoming Legislature intended to put the stamp of its approval upon such transactions. At least there is no hint of it in our statutory law.

The constitution of this State asserts an immortal truism, it may be here appropriately remembered. Its Section 7 of Article I declares that:

"Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

It cannot be disguised that arbitrary power over the property of the landowners of the district is attempted to be established and vested in the Secretary of the Interior by certain provisions of this revised contract which we have had occasion to discuss herein and in the original opinion on file in this case.

It should not be overlooked either that Article 25 of the revised contract vests additional power in the hands of the Secretary thus:

"25. The Secretary reserves the right, so far as the purport thereof may be consistent with the provisions of this contract, to make rules and regulations and directives and to add to and modify them as may be deemed proper and necessary to carry out the true intent and meaning of the law and of this contract. Such rules and regulations may provide for operating procedures and practices, accounting procedures and practices, and the maintenance of reserve funds and depreciation funds, and the District agrees to observe such rules, regulations and directives."

What those "rules, regulations and directives" shall be can be found only in the mind of the Secretary of the Interior. The only limit imposed appears to be they should be "consistent with the provisions of this contract" and to "carry out the true intent and meaning of the law and of this contract." It would seem that these provisions of Article 25 undertake to surrender to the Secretary of the Interior the right to construe and interpret the revised contract, a function vested only in the courts of this State. By Article 25 aforesaid it would appear also that the advantage of having a definite written contract indicating just what each party can rightfully exact from the other has been altogether swept away.

The respondents express alarm that the reclamation of the arid lands of our State will be hindered or prevented by the decision of this court. We must decline to agree. Contracts of the nature hereinabove discussed can certainly be framed without incorporating the inequities and arbitrary provisions, which we have discussed, and which are embodied in the agreement at bar. That contract was revised no less than seven (7) times before the District was persuaded to execute it. No reason is perceived why additional conscientious efforts on the part of those who drew it may not have produced a much more satisfactory instrument.

No useful purpose would be served by extending this opinion further. We have found that over a period of more than a quarter of century petitions for re-hearing after decisions of this court have been handed down have, for the most part, simply re-argued and repeated views which were fully considered by the court before the original opinion was filed, and after such consideration, rejected. The instant petition for

re-hearing is no exception. We must decline to re-traverse paths already travelled.

We may here appropriately mention that while Mr. Justice Ilsley, who sat on the argument of this case, participated in the many conferences which preceded its disposition, and concurred in the opinion filed, was prevented by his sudden passing from expressing formally his approval of what has above been said, yet, we have little doubt from what we remember of his views on this matter, that he would emphatically have agreed to what hereinabove has been set forth. The people of this State have long known his ability as a lawyer, his honest and practical approach to all questions involving the irrigation law and contracts.

Without more we are obliged to rule that the petition for re-hearing should be denied.

*Denied.*

BLUME, C. J., concurs.